UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————x

CORRINE LYNCH,

       Plaintiff

         **Docket No: 24-CV-07795 (DG) (JAM)**

-against-


THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK, DAVID BANKS, Chancellor
and KATHERINE RODI, Director of Employee Relations,

       Defendant

——————————————————————x


# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

CORRINE LYNCH
 *Plaintiff Pro Se*
34 Cheslan Ct
Oceanside, NY 11572
516-316-0451
Email: rins083082@aol.com

.

1

## PRELIMINARY STATEMENT

Plaintiff CORRINE LYNCH ("Plaintiff") submits below her opposition to the Defendants' Motion To Dismiss and argues that none of Defendants' arguments disputing Plaintiff's alleged causes of action are sufficient to dismiss her Complaint, and the Defendants' Motion To Dismiss must be denied in its' entirety.

Defendants want this court to believe that an experimental, temporary, City-ordered Emergency Usage COVID vaccine could trample Plaintiff's Constitutional rights to her sincere religious beliefs and due process under the 1st and 14th Amendments. This makes no sense. Defendants' Motion to Dismiss is a thinly veiled attempt to reframe Plaintiff's case into something that it is not and redirect this Court's attention from the egregious and unscrupulous actions and behaviors of the Defendants. Defendants' papers ignore the four corners of Plaintiff's Complaint and disregard the facts in the detailed factual allegations should be accepted as true. Plaintiff requests that each and every argument, cause of action, background fact and Exhibits in her Complaint be incorporated in full into the arguments made here by reference. The Exhibits already submitted to this Court in support of her causes of action are:

**EXHIBITS A-K.** Attached to this Opposition are **EXHIBITS L-R.**

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a pleading must. contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss brought pursuant to Rule 12(b)(6), the pleadings must contain enough facts to state a claim to relief that is plausible on its face." Dellatte v. Great Neck Union Free Sch. Dist., No. 10-cv-4348, 2012 WL 164078, at *1 (2d Cir. Jan. 20, 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).

2

The court must accept all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008). Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they plausibly give rise to an entitlement to relief. Iqbal, 129 S. Ct. at 1950. In ruling on a motion to dismiss, a court may consider the facts asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits and any documents incorporated in the complaint by reference. Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010).

## ARGUMENT

### NOTICE OF CLAIM REQUIREMENTS ARE NOT APPLICABLE TO §1983 SUITS BROUGHT IN FEDERAL COURT and HUMAN RIGHTS LAWS HAVE A 3-YEAR STATUTE OF LIMITATIONS

Defendants wrote in their Motion that Plaintiff's NYSHRL and NYCHRL had to be dismissed because they were time-barred due to Education Law §3813 and a 1-year statute of limitation. Defendants are wrong on the Law. Human Rights Laws in New York now have a 3-year statute of Limitations.  On November 17, 2023, Governor Hochul signed State Assembly Bill A00501 into law, extending the statute of limitations for discrimination and retaliation claims brought under the New York State Human Rights Law ("NYSHRL") from one year to three years. Plaintiff filed notices of claim that were received by the Comptroller's Office June 6, 2022, and March 10, 2023. See Defendants' Exhibit I (NOC). New York's Notice of Claim requirements were applicable to §1983 suits in state court but not federal court prior to Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302. See, e.g., Brandon v. Board of Education, 635 F.2d 971, 973 n. 2 (2d Cir. 1980), cert. denied, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); Courtemanche v. Enlarged City School District, 686 F.Supp. 1025, 1032 (S.D.N.Y. 1988); Burroughs v. Holiday

3

Inn, 621 F.Supp. 351, 353-55 (W.D.N.Y. 1985); Williams v. Allen, 616 F.Supp. 653, 656-59

(E.D.N.Y. 1985); Paschall v. Mayone, 454 F.Supp. 1289, 1298 (S.D.N.Y. 1978). Felder v. Casey

noted that although the Supreme Court itself "ha[d] never passed on the question, the lower

federal courts have all, with but one exception, concluded that notice-of-claim provisions are

inapplicable to § 1983 actions brought in federal court." 487 U.S. at 140, 108 S.Ct. at 2307. In

Brandon v. Board of Education, 635 F.2d at 973 n. 2, a ruling was upheld that compliance with

the state's notice-of-claim provision was not a precondition to the district court action. Since the

filing of a notice of claim was not a prerequisite to the federal-court suit, a municipality perforce

could not require a delay of the commencement of a federal-court suit pending an examination

based on such a notice. See Day v Moscow 955 F.2d 807 (2nd Cir 1992). Thus, Plaintiff's CHRL

and SHRL claims are not time barred, and Human Rights Law has, in any case, a 3-year statute

of limitations. Defendants' Motion on this point must be dismissed.

## PLAINTIFF HAS PLED SUFFICIENT FACTS TO SUPPORT HER CLAIM OF DISCRIMINATION

Plaintiff's Complaint cites causes of action against the Defendants who, under color of law,

denied her the due process she was entitled to under the Tenure Law, 42 U.S.C. § 1983, First

and Fourteenth Amendments to the United States Constitution, Civil Service Law Section 75(b),

and Human Rights Law ("SHRL and CHRL"). Yet at the same time, Defendants granted

religious accommodations to hundreds of similarly situated NYC DOE employees.

The discrimination occurred through three distinct phases: First, DOE denial by Solas, the

HR Computer system. The DOE denied 100% of applications through an auto-generated

system on the basis that it was allegedly "more than a minimal burden" to provide any

accommodations. No human being reviewed a single application, and no cooperative

4

dialogue was offered before the auto-generated denials were sent out; Second, an unconstitutional Appeal process set up to be heard by Scheinman Arbitration and Mediation Services (SAMS), which also denied everyone and was declared constitutionally "unsound" by the Court of Appeals (See ¶19, Complaint p.7; Ex. G(1)  Scher letter re Free Exercise, and Order Ex.E; and Third, the Citywide Panel, which denied almost everyone who Appealed the Scheinman Panel with a "de minimis standard in violation of Groff and Dejoy (See ¶10, 14. Complaint). See **EXHIBIT L**. Decisions of Citywide Panel.

The criteria for discrimination under a *prima facie* Human Rights Law claim includes: Plaintiff (1) is a member of a protected class; (2) was qualified for her position and satisfactorily performed her duties; (3) suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination. In this matter, a review of Plaintiff's Exhibits attached to her Complaint and here shows conclusively that Plaintiff was discriminated against as a tenured teacher who has a Constitutionally protected property right to her continued employment with the NYC DOE and cannot be terminated for any reason without a full and fair arbitration hearing pursuant to Education Law 3020-a.See EXHIBIT F(2), Rights of Tenured Teachers, and the case of Elmira City School District v Theresa Usack  Armstrong, New York State Education Department SED #6371, (Feb. 17, 2011). **EXHIBIT M**.

Plaintiff submitted her sincere religious beliefs to the right place in a timely fashion, yet was denied without any lawfully recognizable reason. (See **EXHIBITS A, A(1), A(2)**, Complaint). According to Law and Statute, Plaintiff did not have to "prove" her beliefs in the first place. Others were granted their accommodations, and although the numbers are not exact, the Defendants readily admit to several hundred being allowed to work remotely without getting

vaccinated. They used "undue burden for just about everyone except the favored few, but no rational review can determine why these individuals were approved.

Actually, the case of John De Luca in EXHIBIT L is interesting, because he was granted a religious exception but did not go back on salary because the NYC DOE said this would cause an "undue burden" . No specifics were given at any time, namely because no one kept accurate records of the costs involved. This makes the actual remote working environment standard even more mysterious. No one knows whether there was any standard or guide.

Not only did the DOE lie about an undue burden, but they did not obey their own rules and procedures, to the detriment of Plaintiff. Explosive information was recently released by Lawyer Austin Graff who did depositions of Katherine Rodi and Eric Eichenholtz, the creator of the Citywide Panel. Ms. Rodi testified that she was on a DOE "General Committee" where she and her partners denied everyone their religious appeal without any review. Mr. Eichenholtz could not give any particulars on the exact number of people who were allowed to obtain approvals for their religious appeals, but the DOE personnel who testified in various hearings about the granting of appeals generally agree that between 148-176 NYC DOE educators were granted their request to remain on salary without getting vaccinated. Plaintiff was not one of these people. Why was she treated differently?

Eichenholtz never gave any costs for the salaries or any rationale that justified an "undue burden". He affirmed under oath that the Citywide Panel applied the unlawful de minimis hardship standard rather than the "significant expense or difficulty" standard required by law, failed to consider any of the required statutory factors for economic harm, safety or alternative accommodations, and conducted no individualized assessment of direct threat analysis. He also testified that the City did not actually make any independent undue

6

hardship assessment but simply relied on the DOE's tainted, blanket and unsupported

assertion that it could be an undue hardship to accommodate anyone under the unlawful "de

minimis" burden test. See

**The City of New York and the NYC Department of Education Never Intended on Honoring Requests for Religious Exemptions From Getting the COVID Vaccine By Municipal Workers**
https://advocatz.com/2025/05/28/the-city-of-new-york-and-the-nyc-department-ofeducation-never-intended-on-honoring-requests-for-religious-exemptions-from-getting-thecovid-vaccine-by-municipal-workers/

 The subtitle is:

*"Their Lies About Honoring Title VII and Human Rights Laws Have Misled Court Judges and Created Permanent Harm to City Employees"*

And,

**The Citywide Panel and the Final Judgment in Kane-Keil-New Yorkers for Religious Liberty**
https://advocatz.com/2025/01/25/new-york-state-court-of-appeals-issues-an-amendedjudgment-in-new-yorkers-for-religious-liberty-et-al-v/


The chaotic mess of the explosion of inequalities of law and vaccinations continue today.

The media have highlighted the hundreds of employees who were getting exemptions:

**City Grants Vaccine Mandate Exemptions For Hundreds Of Public School Employees**
https://gothamist.com/news/city-grants-vaccine-mandate-exemptions-hundreds-publicschool-employees
 Gothamist, Sept. 24, 2021.


**COVID-19 exemptions for teachers, principals extended through school year**

By Selim Algar, Published Nov. 20, 2020, 5:02 p.m. ET
https://nypost.com/2022/03/05/nyc-teachers-with-vaccine-exemptions-treated-like-outcasts/


**NYC teachers with vaccine exemptions are being treated like pariahs**
By Melissa Klein, New York Post, Published March 5, 2022
https://nypost.com/2022/03/05/nyc-teachers-with-vaccine-exemptions-treated-like-outcasts/

In addition to the many people named in the articles above, there is RF, who was granted his religious exemption request, and was reassigned to a "rubber room" at St. Brigid's School. His "job" was to check people in and out every day. He said there were seats for about 90 other unvaccinated education employees. After the CVM was made voluntary in 2023, he went back to his position with the NYC DOE, his salary intact. **EXHIBIT N.** NYC DOE delivery people, school bus drivers, as well as food servers were exempt from Defendants' COVID mandate.

At no point was the DOH Order for DOE employees neutral or generally applicable. Also, at **no time** did the COVID Vaccine Mandate change Plaintiff's terms of employment. Defendant has neither a legitimate nor compelling interest in exercising express and overt religious discrimination. Defendant's invocation of "undue hardship" defenses are plainly false pretexts attempting to cover for the Defendant's explicit religious discrimination. Defendants refused to give her a 3020-a hearing, despite convicting her of misconduct and placing her fingerprints in a Problem Code database used by the FBI and Criminal Justice System, without any Notice or due process. See Usack Case Ex. M.

In *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir. 2024), the Tenth Circuit held that state university employees were likely to succeed on Free Exercise and Establishment Clause claims and entitled to preliminary injunction against denials of religious accommodation to a vaccine mandate. In *Does*, the Court affirmed that a vaccine mandate is "in no way generally applicable" when government evaluates employee religious beliefs case-by-case, allowing "individualized exemptions" to applicants whose beliefs, in the government's discretion, merit accommodation. Additionally in that case the Defendant adopted a facially discriminatory policy and then after litigation, offered a so-called "remedial" policy.

8

Plaintiff argues here that the hostility by Defendants toward the Plaintiff in this matter defeats neutrality at every level of review, which suggests pre-textual discrimination.

Defendants started with suspension without pay, then secretly charged Plaintiff with misconduct/insubordination, falsely informed her that they had changed the terms of her employment when no change took place, flagged her files with a "Problem Code" without her knowledge or consent, and never gave her a hearing where she could clarify and particularize her reasons for not getting the COVID vaccination. The U.S. Supreme Court has ruled that this is retaliatory discrimination: Burlington Northern and Santa Fe Railway Company, 548 US 53 (2006) ("that White suffered retaliatory discrimination when she was reassigned to less desirable duties and suspended without pay").

Plaintiff filed an as-applied challenge to the way the CVM was implemented. An as-applied challenge is a legal claim that a law is unconstitutional in the specific context of how it is applied to a particular individual or situation, rather than claiming the law is unconstitutional in all its applications. The Supreme Court in: Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023:

> "The Court holds that showing "more than a de minimis cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. ….. What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test…. Further, a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice, cannot be considered "undue." Bias or hostility to a religious practice or accommodation cannot supply a defense."

As Plaintiff's only options to establish her Constitutional rights under the 14th Amendment due process pursuant to Section 1983 was to submit to the Scheinman panel, SAMS, or the Citywide

Panel, which never really reviewed any religious Appeal and if they did, they still where an "undue burden" was never explained. **EXHIBIT L.** The Plaintiff has pleaded facts stating a plausible action that Defendants have violated the Free Exercise Clause. Under the Free Exercise Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, "[g]overnment enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny." Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002).". In this case, for the reasons stated throughout this letter, Defendants' policies imposed on Plaintiff burdened the exercise of her sincere Christian beliefs.

The Complaint sets forth a prima facie case of discrimination because the allegations viewed in a light most favorable to the Plaintiff shows that Plaintiff was terminated because of her sincere religious beliefs that God could not allow her to be injected with the COVID Vaccine. Lowman v. NVI LLC, 821 Fed. Appx. 29, 31 (2d Cir. 2020); see also Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 429 (E.D.N.Y. 2016) (SHRL). Specifically, Plaintiff has stated that Defendants' discriminatory imposition of the COVID Vaccine Mandate on employees and, at the same time, placing her fingerprints into the "Problem Code" has permanently scarred her career, and life. As long as Plaintiff is on the Problem Code database, she is guilty of "misconduct" and is blocked not only from being rehired at the Defendant DOE, but also barred from working for most schools and agencies in the private sector in New York City.

Defendants have failed to prove that their COVID Vaccine Mandate (CVM) and Plaintiff's termination were lawfully executed under prevailing policy and the Constitution. Here, a protected right was discarded, and a hearing never took place that fairly reviewed Plaintiff's religious Appeal. Instead, the DOE employed discriminatory policies rather than good faith review to restrict accommodations.

10

From 2019 through to today, the City has continued a pattern and practice of deceit in

terminating protected, unvaccinated DOE employees while touting the "danger" of these

unvaccinated people in school buildings. Yet Wolf Blitzer interviewed CDC Director

Rochelle Walensky on CNN, and Walensky acknowledged on national television that the

vaccines could not stop transmission of COVID.

https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

The Supreme Court case the EEOC v. Abercrombie & Fitch Stores, Inc. 575 U.S. 768

(2015) concluded that "An employer may not make an applicant's religious practice, confirmed

or otherwise, a factor in employment decisions. The First Amendment to the Constitution

protects Plaintiff's free exercise of religion and mandates state accommodation for members of

religious groups who object to the vaccinations on religious grounds. The Free Exercise Clause

recognizes and guarantees Americans the ''right to believe and profess whatever religious

doctrine [they] desire.'' Employment Division, Department of Human Resources of Oregon v.

Smith, 494 U.S. 872, 877 (1990).

"The Defendant never offered any reasonable accommodation to the Plaintiff that

would both satisfy the Plaintiff's sincere religious beliefs and the Defendants' concern for "a

safe environment for in-person learning." The Free Exercise Clause also ascertains that

government may not attempt to regulate religious beliefs, compel religious beliefs, or punish

religious beliefs. Sherbert v. Verner, 374 U.S. 398, 402 (1963); Torcaso v. Watkins, 367 U.S.

488, 492–93, 495 (1961); and United States v. Ballard, 322 U.S. 78, 86 (1944).

Government may not discriminate against or impose special burdens upon individuals because of

their religious beliefs or status. Plaintiff argues that the "criteria" mystery (i.e. details as to what

11

the criteria are) of the Citywide Panel show animus and discrimination against the unvaccinated Plaintiff because anything could be used against her. She was not told why a person was granted a religious exemption or, like her, denied. What made her different in a class of folk already in a "different" – but unknown category?  See Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; McDaniel v. Paty, 435 U.S. 618, 627 (1978). The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; Sherbert v. Verner, 374 U.S. 402 (1963).

''If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith herein.''. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious tradition. Frazee v. Illinois Dept. of Employment Security, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, ''religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'' Church of the Lukumi Babalu Aye v. Hialeah, 508 U.S. 520, 531 (1993) They must merely be ''sincerely held.'' Frazee v. Illinois Dept. of Employment Security, 489 U.S. 834 (1989). Importantly, the protections guaranteed by the Free Exercise Clause also extend to acts undertaken in accordance with such sincerely held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to ''exercise'' religion, not just the

12

freedom to ''believe'' in religion. Employment Div. v. Smith, 494 U.S. 877 (1990); Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 716 (1990); McDaniel v. Paty, 435 U.S. 627 (1978; Sherbert v. Verner, 374 U.S. 403–04 (1963); and Wisconsin v. Yoder, 406 U.S. 205, 219–20 (1972).

The Court in DOES (10th Cir.) stated that:

"a government policy that requires an intrusive inquiry into the validity of religious beliefs violate the Establishment Clause regardless of any purported government interest." 100 F.4th at 1268."

A law is not neutral if it singles out particular religious conduct for adverse treatment, treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons, applies uncalled for restrictions on religious conduct''; or ''accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices.'' Id. 538. A law is not generally applicable if ''in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief,'' Id 543., including by ''fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does'' the prohibited conduct, id., or enables, expressly or de facto, ''a system of individualized exemptions,'' as discussed in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 884 (1990); see Church, 537. ''Neutrality and general applicability are interrelated, . . .[and] failure to satisfy one requirement is a likely indication that the other has not been satisfied.'' Id, 531.

A law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. See Trinity Lutheran Church of Columbia, Inc. v. Comer, Director, Missouri Department of Natural Resources, 582 U.S. (slip opinion pages 9–11) (2017).

13

Even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. Trinity Lutheran Church of Columbia, Inc. v. Comer 582 U.S. (slip opinion. Page 6) (2017); see also Good News Club v. Milford Central Sch., 533 U.S. 98, 114 (2001), and Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 837, 841 (1995)). The Defendants' Motion to Dismiss must be denied.

## PLAINTIFF HAS SUFFICIENTLY PLED DEFENDANT'S FAILURE TO ACCOMMODATE

In order to adequately allege a failure to accommodate a religious belief claim Plaintiff must allege that "(1) she has a bona fide religious belief that conflicts with an employment requirement; (2) she informed the employer of her belief; and (3) she was disciplined for failing to comply with the conflicting employment requirement." Marte v. Monetefiore Med. Ctr., No. 22-CV-03491(CM), 2022 U.S. Dist. LEXIS 186884, at *19 (S.D.N.Y. Oct. 12, 2022). All of these have been complied with by Plaintiff. Defendants had knowledge of Plaintiff's sincerely held religious beliefs yet chose to ignore these beliefs, denied her exemption request and Appeals based upon an unconstitutional ruling that cited "undue burden" on the Department without any further details or reason, and terminated her employment. This directly contradicts the ruling in Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023.

Human Rights Law says that the employer must give a reasonable accommodation even if claiming an undue burden. An explanation for the denial, presumably an alleged "undue burden", was never given to Plaintiff in violation of Groff v Dejoy:  an employer that denies a religious

14

accommodation [must] show that the burden of granting the religious accommodation would result in "substantial increased costs in relation to the conduct of its particular business."…. the Court reasoned that undue hardship "means something very different from a burden that is merely more than de minimis, i.e., something that is 'very small or trifling.'" The Court also reviewed the 1977 decision in Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977), which has been interpreted as holding undue hardship means de minimis cost. Furthermore,

"With respect to the new "substantial increased costs" standard, the Court explained that employers must take into account "all relevant factors in the case at hand, including the particular accommodation at issue and their practical impact in light of the nature, size, and operating cost of an employer." (Groff v Dejoy)

Defendants have blatantly ignored all the laws demanding a reasonable accommodation for Plaintiff. Defendants never offered any reasonable accommodation to the Plaintiff that would both satisfy the Plaintiff's sincere religious beliefs and the Defendant's concern for "a safe environment for in-person learning." *Ansonia Bd. ofEduc. v. Philbrook,* 479 U.S. 60, 68-69 (1986). It is well-known that the City has ATRs and remote teaching throughout NYC. Defendants never offered a single document or factual evidence that showed any effort towards accommodating Plaintiff, and never gave any rational basis to deny her religious exemption request and any accommodation.  The Department totally failed in this duty. The remedy for the destruction of Federal rights seen here could have been to place anyone who had a sincere religious belief that prohibited him/her from being vaccinated against COVID into an alternate site which the Defendants called "Reassignment", or the "Rubber Room". See

**The "Gotcha Squad" and the New York City Rubber Rooms**

**https://nycrubberroomreporter.blogspot.com/2009/03/gotcha-squad-and-new-york-city-rubber.html**

Indeed, Defendants fail to acknowledge their well-known accommodations called the "Rubber Rooms" or Reassignment rooms set aside for employees who are removed from their jobs but not taken off salary. Defendants already rent spaces throughout New York City for people who are reassigned or are ATRs. See ¶47, Complaint. The process and substance of the rubber rooms has been created and paid for by the NYC DOE for more than 22 years. Absent Teacher Reserve employees are tenured teachers who are fully employed as substitutes, to replace those who are absent. Also, the Defendants have been actively hiring new teachers for remote work since 2020. See **EXHIBIT O** Teacher Vacancy for remote work.

The sob story given by the Defendants about "undue burden" is simply, and outrageously, false and never suggests an accommodation, not because Defendants did not have a reasonable accommodation to offer, but because Defendants did not want to give any. the problem code being placed on the fingerprints and personnel file of every unvaccinated employee of the Department, the process designed to remove the unvaccinated from the City's payroll became punitive. The Motion to Dismiss must be denied in full.

### PLAINTIFF'S COMPLAINT PROPERLY PLEADS A FIRST AMENDMENT RETALIATION CLAIM and DEPRIVATION OF 14TH AMENDMENT DUE PROCESS

To set forth a prima facie case for First Amendment retaliation under Section 1983, Plaintiff must allege that (1) her right to her religious beliefs were denied to her; (2) she suffered an adverse employment action; and (3) a causal relationship between the two existed in that her religion/religious beliefs was a substantial or motivating factor for the adverse employment

action. Gronowski v. Spencer, 424 F.3d 285 (2d Cir. 2005). Plaintiff properly made those allegations in her Complaint.

Plaintiff demonstrated in her Complaint that she engaged in speech protected by the First Amendment, namely discussing her religious beliefs, that she suffered an adverse employment action, and that a causal connection between the two existed, "in that the speech [about her religion] was a substantial or motivating factor for the adverse employment action." Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d. Cir. 2005). Indeed, on October 4, 2021, when Plaintiff did not submit a valid vaccination card to the Defendant, she was placed on the Problem Code. This is causal evidence to prove the problem code and not getting vaccinated are connected. See EX. H, I, J in the Complaint.

The threshold inquiry in any First Amendment retaliation case is whether the employee was speaking as a citizen on a matter of public concern. Woodlock v. Orange Ulster B.O.C.E.S., 281 F. App 'x 66, 68 (2d. Cir. 2008) (quoting Garcetti v Ceballos, 547 U.S. 410, 418 (2006)). Plaintiff's speech is constitutionally protected if she was speaking both (1) as a citizen rather than pursuant to her employment duties, and (2) on a matter of public concern. This is exactly what she was doing when she submitted her sincere religious beliefs to Defendants. Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 205 (E.D.N.Y. 2009) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

On a motion to dismiss, a reasonable inference of a causal connection is all that is required. See Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999) ("[T]he plaintiffs pleading need not clearly establish that the Defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect."); Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001). This "can be established either indirectly  by

means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). A court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of [each] particular case [], " Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009). Where a Plaintiff asserts enough direct evidence of retaliatory animus to create a triable question of fact on the issue of a causal connection as here, a longer lapse between the protected speech and the adverse employment action Defendants not necessarily "conclusively establish lack of causation." See Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003).

Plaintiff was punished with a Problem Code without any notice, and no procedure to remove it from her personnel file. This was her punishment for having religious beliefs that forbade her from being vaccinated by the COVID vaccine. Indeed, she was never given any due process because both the solas submissions and the Citywide Panel never heard her arguments, they just pretended to, under color of law.

Reading the complaint broadly and drawing all reasonable inferences in Plaintiff's favor, the complaint alleges sufficient facts to state a plausible claim for retaliation and discriminatory animus by Defendants. She has also shown that the COVID Vaccine Mandate as applied in 2021 to the DOE employees was unlawful, unconstitutional, and not enforceable.

## PLAINTIFF HAS ADEQUATELY PLED A STIGMA PLUS CLAIM AND FRAUD IN THE INDUCEMENT

The fraud of Arbitrator Scheinman cannot be ignored. He deliberately threw away Constitutional procedures of due process for NYC DOE employees in order to make sure every employee was terminated who dared to challenge the COVID Mandate. Also, he ruled that everyone had to ask

for an "exception", when under Human Rights Law there is no mention of any allowable 'exception', only an "accommodation". So, Mr. Scheinman made up an alternate route for the Appeals that he knew would not work, then denied everyone. He and the Defendants wanted to stay in control and did not want any challenges that could lead to an unvaccinated employee remaining at work. So, when Arbitrator Martin Scheinman issued his Award on September 10 2021, ordering every NYC Department of Education employee to get vaccinated with the COVID vaccine and hand in a valid card by October 4, 2021, or you would be put on Leave Without Pay (LWOP) and subsequently terminated and your health insurance taken away, he created this lawless employment ruling out of thin air. Mr. Scheinman then hired his company, Scheinman Arbitration and Mediation Services, to arbitrate all the lawless exemption appeals. SAMS Arbitrators pretended to be in compliance with the UFT Contract and laws of New York, yet this was a hoax. Sheinman later apologized for the "error" in his June 27, 2022, Award. See **EXHIBIT G**, Complaint.

The Kane-Keil Panel also sounded the alarm on the fraudulent use of "religious exemption" in Scheinman's Award:

> "At times, the parties appear to use the terms "exemption" and "accommodation" interchangeably. As we use those terms, however, exemptions are different from accommodations. The Vaccine Mandate includes *exemptions* for certain objectively defined categories of people, like delivery workers. Those who are exempted from the Mandate are not subject to its terms. By contrast, employees who *are* subject to the Mandate can request accommodations under Title VII and analogous state and city law.

See also *We the Patriots USA, Inc. v. Hochul*, 2021 WL 5276624, at *1 (2d Cir. Nov. 12, 2021)."

19

In fact, when researching **Religious Exemption Laws,** New York State has no religious exemption law related to the provision of services. What states don't allow religious exemptions?

Currently, only six states in the country do not allow religious exemptions:
- California.
- Maine.
- Mississippi.
- New York.
- West Virginia.
- Connecticut.

There is a footnote to this, namely that "Targeted state religious exemption laws permit people, churches, non-profit organizations, and sometimes corporations to seek exemptions from providing services that burden their religious beliefs." Presumably, these categories do not include the City Agencies such as the NYC Education Department, police, fire, etc.

But the Court of Appeals saw this ruse of Mr. Scheinman and threw out the September 10, 2021, Award. Unfortunately, the Citywide Panel decisions were equally unlawful and unconstitutional. See Website Articles posted in pp. 7-8 above.

Finally, the Problem Code is not hidden from DOE employees and vendors, and UFT Representatives. See EXHIBIT J, Declaration of Betsy Combier and Email of Eric Amato.

Therefore, the Problem Code is a stigma on employees, their career and life. See:

**The New York City Department of Education's "Problem Code" is an Unlawful Flag on an Employee's Fingerprints**, Parentadvocates.org,
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8884
**In NYC the Absent Teacher Reserve and The Rubber Room Are Both Strategies For Unlawful Denial of Tenure Job Protections**
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8958
**The Problem Code, Fingerprints, The FBI, and the COVID Mandate**
**NYC Rubber Room Reporter, February 12, 2023**
https://nycrubberroomreporter.blogspot.com/2023/02/the-problem-code-and-covid-mandate.html
**The Hidden Rubber Rooms of New York City Create a Fiscal Nightmare**

https://nycrubberroomreporter.blogspot.com/2020/08/the-hidden-rubber-rooms-of-new-york.html

### **ARTICLE 78 IN STATE COURT WAS NEVER AN OPTION**

An Article 78 is a Petition used to compel a state or local body or officer to act when it has

"failed to perform a duty enjoined upon it by law;" to prohibit a state or local body or officer

from acting beyond its authority or invalidate such an action; to challenge a government decision

that was made in violation of lawful procedure, was affected by an error of law, was "arbitrary

and capricious," or constituted an abuse of discretion; and to contest a government decision

made at a hearing that was not supported by "substantial evidence."

None of these actions are relevant for the Constitutional deprivations both of law and statute that

this case was filed to address. Federal court is the proper forum when the case involves federal

constitutional claims or the legality of a federal law, as in this matter.

### **KATHERINE RODI DIRECTED THE PLACEMENT OF THE PROBLEM CODE ON PLAINTIFF'S PERSONNEL FILE and DENIED PLAINTIFF'S REQUEST FOR ACCOMMODATION**

The "Problem Code", which was placed on Plaintiff's personnel file without her knowledge

on October 4, 2021. This made the LWOP into a disciplinary action accusing Plaintiff and

of misconduct. TheProblem Code is mentioned in Plaintiff's Complaint (Ex. **H,I,J**)

pp.2,3,8,12,13,15,18. Recent explosive news is that Ms. Rodi testified that she was on a

DOE "General Committee" where she and her partners ***denied everyone*** their religious

appeal without any review. The full transcript of Ms. Rodi is here:

**The City of New York and the NYC Department of Education Never Intended on Honoring Requests For Religious Exemptions From Getting the COVID Vaccine By Municipal Workers**
https://advocatz.com/2025/05/28/the-city-of-new-york-and-the-nyc-department-of-education-never-intended-on-honoring-requests-for-religious-exemptions-from-getting-the-covid-vaccine-by-municipal-workers/

By placing Plaintiff's fingerprints into a "problem code" or no-hire database, LWOP became a disciplinary action, with a charge of misconduct/insubordination due to Plaintiff holding onto her religious beliefs and refusing the vaccine. These actions by Defendants may clearly be defined as disciplinary retaliation, motivated by an intent to harm. (See Burlington, p. 9). Even more shocking is the fact that Defendants *never* told her about this flag. She heard about it from Advocatz writer Betsy Combier in November 2022, and from John Bursch, who argued the Problem Code at the Court of Appeals on February 8, 2023, and he had the Declaration of Betsy Combier and the email from Eric Amato as proof.

The Code became the charge for misconduct Plaintiff was given to her for requesting a religious accommodation. Ms. Rodi, the Director of Employee Relations at the NYC DOE, is also in charge of placing Problem Codes on employees' personnel files after they have received a Letter to File or Complaint. Here, Rodi did not follow her own procedure, since Plaintiff never received a Letter To File for not getting vaccinated. See PERB U-32479, **EXHIBIT P.**

Ms. Rodi is in charge of the Problem Code placement on an employee's personnel file. In 2017 she wrote in a sworn Affidavit information about the flag on a personnel file. See **EXHIBIT Q.** In 2015 Ms. Rodi testified at PERB, and the process she described for the flag on a personnel file is not what happened here. Also, Defendant Rodi has never told Plaintiff what the remedy was or how to get off of the code. The Code became the charge for misconduct Plaintiff was given for requesting a religious accommodation. See RODI Testimony. **EXHIBIT R**.

Defendant Katherine Rodi must not be dismissed as a party in this case. She has been directly involved in all stages of the Constitutional deprivation Plaintiff has cited herein.

## **PLAINTIFF HAS PROPERLY PLEADED A VIOLATION OF 1983**

Plaintiff was placed on the 'Problem Code' at Defendants Office the Human Resources Office of Personnel Investigations on or about October 4, 2021, without her knowledge or consent. The 'Problem Code' is used for employees who have committed what the New York City Department of Education considers misconduct or incompetence. Therefore, the New York City Department of Education has considered Plaintiff not getting vaccinated as 'misconduct,' which means that Plaintiff is unemployable as a teacher in education. Plaintiff was never given a hearing to fight this stigma on her career. This is against her Constitutional protected right as a tenured teacher. There is no reason for this, and every reason to give Plaintiff a hearing pursuant to Education Law §3020 which is guaranteed to her by Law and contract (CBA, Article 21G)

By being placed on such a list without Defendants at least affording a hearing violates Plaintiff's due process rights. Here, there is an implied allegation of impropriety and illegality on the part of Plaintiff that seriously impugned her professional reputation and adversely reflected on her record as a teacher and that her ability to find similar employment within her chosen profession has been substantially impaired by Defendants' action. Board of Regents v Roth, 408 U.S. 564, 573; Bishop v Wood, 426 U.S. 341, 348; Codd v Velger, 429 U.S. 624, 627.

In Donato v. Plainview-Old Bethpage Central School District, 96 F.3d 623, (2nd Cir. 1995), the Court decided that Donato, who was terminated during her probationary period, was entitled to a name-clearing hearing because the statements made concerning her performance in the job impugn her professional reputation in such a fashion as to effectively put a significant roadblock in her continued ability to practice her profession. See also the Usack case, Ex.M.

In addition, courts have ruled that a name-clearing hearing is warranted even if there has been no publication concerning the reason for the employee's dismissal in cases where it determines that discharging the employee for the reasons stated does stigmatize the individual and may adversely

23

affect the individual's prospects for future employment. Plaintiff falls into this rubric, and the problem code amount certainly brands a teacher with a "stigma plus" inherently likely to foreclose all future employment in educational settings. It is the rule that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to her, notice and an opportunity to be heard are essential. Plaintiff's due process rights pursuant to the 14th Amendment of the United States Constitution have been violated.

## CONCLUSION

Plaintiff has successfully pled in her Complaint that the NYCDOE failed to provide a reasonable accommodation and did not give her the due process she was due pursuant to Constitutional law. Only new hires to the Department of Education had to get the vaccine as a condition of employment. The claims contained within the four corners of Plaintiff's Complaint go straight to the heart of a substantive due process claim. The very idea that a person's livelihood which is supposed to be determined through a fair evaluation of an educator's job performance, is denied in open and blatant retaliation for requesting an accommodation is outrageous and unconstitutional in the widest sense. There is no reasonable interpretation of the actions by Defendant alleged within the Complaint that could or should be excused as negligence or mistake.

Plaintiff's termination was pre-planned and part of a strategy to deny state and Federal laws and rights to certain tenured employees of the Department. Even if such a definition is up for debate, it is inapplicable in a motion to dismiss stage, and a simple reading of the Complaint amply demonstrates that conscience shocking behavior has been sufficiently alleged to permit this cause of action to continue through to discovery as a matter of law. Defendants' Motion To Dismiss must be denied.

**WHEREFORE,** the Plaintiff demands judgement against the Defendants for all compensatory, emotional, psychological and punitive damages, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that this Court grant Plaintiff any other relief to which she is entitled, including but not limited to:

1.    Awarding Plaintiff her former salary on her current job with the Department.

2.    Awarding Plaintiff all the backpay, TDA and pension benefits as well as other financial damages that ensued after she was placed on a lawless and unconstitutional Leave Without Pay in October 2021.

3.    Removing Plaintiff from the Problem Code.

4.    Considering Plaintiff is prose, an opportunity to Amend her Complaint after submission of Defendants' papers.

5.    Granting such other and further relief that the Court seems just and proper.

Dated: June 12, 2025         /s/Corrine Lynch
                                              Corrine Lynch

# Exhibit L

| From: | Paulson, Susan (Law) |
|---|---|
| To: | Sujata Gibson; bblack@nelsonmaddenblack.com; Jonathan Nelson; Sarah Child |
| Cc: | Dearing, Richard (Law); Slack, Devin (Law) |
| Subject: | FW: Appeal Panel Decision Summaries |
| Date: | Monday, December 13, 2021 4:27:15 PM |

Counsel,

I am forwarding to you the below summaries of the reasons for the decisions on your clients' appeals, which I received at 3:02 p.m. from the Citywide Panel.

Susan

Susan Paulson
Senior Counsel │ Appeals Division
New York City Law Department
100 Church Street
New York, New York 10007
(212) 356-0821 │ spaulson@law.nyc.gov

The summaries of the reason for the decision in each appeal is below:

**APPEAL NO. 00004822, Sarah Buzaglo**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Buzaglo's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Rather, the appellant's decision not to vaccinate comes from non-religious sources:  a belief that the mandate is unconstitutional – a legal contention that has been rejected by courts of competent jurisdiction -- and factual beliefs about the vaccination that conflicts with the factual findings of the DOHMH Commissioner in imposing the mandate.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004823, Matthew Keil**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Keil's reasonable accommodation.  One panel member found that appellant articulated a sincerely held religious belief that precludes vaccination and be entitled to a reasonable accommodation if one did not present an undue

hardship.  The others did not reach this issue because the panel determined that a religious accommodation cannot be granted because, even assuming a valid basis for a reasonable accommodation, the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004824, Ingrid Romero**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Romero's reasonable accommodation. The record before the Panel demonstrated that the employee's articulated religious beliefs do not appear to be the basis for the appellant's decision not to vaccinate in view of the fact that she has previously accepted comparable medical treatments.  While the appellant claims that she changed her views three years ago, she points to no examples to demonstrate how she has acted on these changed beliefs outside the specific context of COVID-19 vaccines.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004825, Heather Clark**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Clark's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Rather, the appellant's decision not to vaccinate comes from non-religious sources:  a fact-based review of CDC information about the vaccine and concerns about vaccine efficacy.  Supplemental questions further support the conclusion, at bottom, that the appellant is making fact-based choices about foods and medicines.

One panel member would also deny the reasonable accommodation on the grounds of undue hardship.  One panel member believes appellant has sufficiently established a sincerely held religious belief that precludes vaccination, and would vote to grant the accommodation sought.

**APPEAL NO. 00004826, Robert Gladding**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Gladding's reasonable accommodation.  The record before the Panel demonstrated that the employee's sincerely held

religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Indeed, the appellant explains his understanding of the religious doctrine articulated is that it is ultimately appellant's choice to take or abstain from food and medication based on his view of the facts and circumstances and his documentation from clergy likewise supports this understanding. In this case, appellant acknowledged he considered whether to take the vaccine and ultimately chose not to. The appellant is not entitled, under the law, to a reasonable accommodation concerning his personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004827, Michael Kane**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Kane's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Indeed, the appellant explains his understanding of the religious doctrine articulated is that it is ultimately appellant's choice to take or abstain from food and medication based on his factual determination as to whether he considers the item to contain pollutants. Appellant, despite being given an opportunity to do so, did not list any substances that fall into this category. The appellant is not entitled, under the law, to a reasonable accommodation concerning his personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004828, Stephanie DiCapua**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant DiCapua's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Rather, it appears the employee's decision to refuse vaccination is based on her factual views of the COVID-19 mandate and vaccine. The employee did not provide, beyond the most general response, any examples of other medications or specific vaccines she has refused due to her articulated religious belief.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004829, Nwakaego Nwaifejokwu**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Nwaifejokwu's reasonable accommodation. The record before the Panel demonstrated that the employee holds sincerely held religious beliefs sufficient to justify a reasonable accommodation if such accommodation did not present an undue hardship. However, the panel believes the DOE has successfully demonstrated that an accommodation, in appellant's case, would create an undue hardship if granted. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.

**APPEAL NO. 00004830, Sasha Delgado**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Delgado's reasonable accommodation. The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief she articulated would preclude her from vaccination. While appellant said she would abstain from other medication should she learn similar things about its development, the only medication in which appellant seems to have had sufficient concern to research whether it was tested on such cells is the COVID-19 vaccine. Indeed, appellant suggests that she may have taken similar medications in the past based on the "belief" that they were not tested on fetal cells. These responses strongly indicate appellant is taking a different approach with respect to the COVID-19 vaccine than she does in analogous circumstances.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004831, Margaret Chu**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Chu's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the

panel does not question, are not preventing the employee from vaccination. Indeed, the religious doctrine articulated provides, ultimately, for appellant to choose to take or abstain from vaccination based on her view of the facts and circumstances. The appellant is not entitled, under the law, to a reasonable accommodation concerning her personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004832, John Deluca**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Deluca's reasonable accommodation. The record before the Panel demonstrated that the employee holds sincerely held religious beliefs sufficient to justify a reasonable accommodation if such accommodation did not present an undue hardship. However, the panel believes the DOE has successfully demonstrated that an accommodation, in appellant's case, would create an undue hardship if granted. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.

**APPEAL NO. 00004833, William Castro**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to REVERSE the DOE's determination and grant Appellant Castro's reasonable accommodation. The record before the Panel demonstrated, to the satisfaction of two panel members, that the employee has sufficiently established that he holds sincerely held religious beliefs, of which he and his family have consistently adhered to, that require appellant to abstain from vaccination. The other panel member would deny the accommodation on the ground that the record demonstrates the appellant's choice not to vaccinate is a result of his personal decision, not a religious practice or belief.

The record is unclear whether the DOE denied appellant's accommodation because it believed the accommodation presented an undue hardship. In any event, the DOE did not respond to the panel's request for specific details about such an argument if it did. However, we note that, as part of the accommodation, the DOE may, if it so chooses, reassign appellant to a non-classroom position in order to comply with the Health Commissioner's mandate that unvaccinated individuals should not be present in schools or around children.

**APPEAL NO. 00004834, Trinidad Smith**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has

voted to AFFIRM the DOE's determination to deny Appellant Smith's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Indeed, the appellant, in his documentation, refused to rule out use of such medications if ultimately it was a necessary medical intervention for him instead noting, thus far, he has had no such occasions to require medication and had not previously been vaccinated.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004835, Dennis Strk**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Strk's reasonable accommodation.  The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief he articulated would preclude him from vaccination.  Specifically, appellant's responses are equivocal with regard to how acts on the articulated belief outside of the specific context of COVID-19 vaccination.  For example, appellant does not deny using medications that are tested on fetal cell lines, only that he tends to "avoid" them and pursue alternatives if available.   The submissions demonstrate the appellant is making a fact-based decision concerning vaccination and, in doing so, relying on incorrect facts regarding COVID-19 vaccines, such as that all COVID vaccines contain fetal cells.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

# Exhibit M

**STATE OF NEW YORK EDUCATION DEPARTMENT**

**In the Matter of the Arbitration of Education Law § 3020 (a) Proceedings**

**Elmira City School District, Employer,**

    **-against-**

**Theresa Usack Armstrong, Respondent**



**Subject: SED File # 6,371**

Nancy Faircloth Eischen, Arbitrator

## Appearances

For the Employer:

    **SAYLES & EVANS. LLP**
    **By:**
        **James Young, Esq.**

For the Respondent:

    **SCHOOL ADMINISTRATORS ASSOCIATION OF NEW YORK STATE**
    **By:**
        **Arthur Scheuremann, Esq.**
        **Robert Fullem, Esq.**

## PROCEEDINGS

The NY State Education Department designated me hear this case and issue an Opinion and Award, under the terms of Section 3020 (a) of the Education Law. Hearings were held on September 2 and 3, 2009, November 5 and 6, 2009 and January 28 and 29, 2010, in Elmira, N. Y. Both Parties were represented by Counsel and afforded full opportunity to present testimony subject documentary evidence, testimony subject to cross-examination and oral argument in support of their positions. Ms. Theresa Usack Armstrong (hereinafter "Usack" or "Respondent") was present throughout the proceedings and testified as a witness in her own behalf. Following receipt of the transcribed stenographic record, Counsel for the Parties submitted and exchanged post-hearing briefs, whereupon the record was declared closed.

## ISSUES

1)    Did the Elmira School District have just cause to suspend the Grievant, Theresa Usack Armstrong?

2)    If not, what shall be the remedy?

## PERTINENT STATUTORY PROVISIONS

## NEW YORK STATE EDUCATION LAW

**Section 3012**

[Teachers] ... shall hold their respective positions during good behavior and efficient and competent service, and shall not be removed except for any of the following causes, after a hearing, as provided by section three thousand twenty - a of such law: (a) insubordination, immoral character or conduct unbecoming a teacher, (b) inefficiency, incompetency, physical or mental disability, or neglect of duty-, (c) failure to maintain certification.
*   *   *

**Section 3020**

1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article.
                                                    ***

**Section 3020-a**

*4. Post hearing procedures.* (a) The hearing officer shall render a written decision within thirty days of the close of the hearing ... , and shall forthwith forward a copy thereof to the commissioner of education who shall immediately forward copies of the decision to the employee and to the clerk or secretary of the employing board. The written decision shall include the hearing officer's findings of fact on each charge, his or her conclusions with regard to each charge based on said findings and shall state what penalty or other action, if any, shall be taken by the employing board. At the request of the employee, in determining what, if any, penalty or other action shall be imposed, the hearing officer shall consider the extent to which the employing board made efforts toward correcting the behavior of the employee which resulted in charges being brought under this section through means including but not limited to: remediation, peer intervention or an employee assistance plan.  In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, suspension for a fixed time without pay, or dismissal.  In addition to or in lieu of the aforementioned penalties, the hearing officer, where he or she deems appropriate, may impose upon the employee remedial action including but not limited to leaves of absence with or without pay, continuing education and/or study, a requirement that the employee seek counseling or medical treatment or that the employee engage in any other remedial or combination of remedial actions.

## BACKGROUND

Theresa Usack Armstrong, formerly known as Theresa Armstrong ("Ms. Usack" or "Respondent"), entered employment with the Elmira New York School District, ("District") in March 2002.  Her initial probationary appointment was as an Assistant Principal position at Southside High School ("SHS"), under Principal Lisa Kelly. Principal Kelly and Assistant Principal Usack were assigned at SHS, and later Ernie Davis Middle School ("EDMS"), as part of a special team of professional educators charged by the State Education Department ("SDE") with implementing Commissioner of Education directives to develop a corrective action plan for the District's chronically underperforming District schools. Such corrective action plans for SINI-listed schools

can involve school reorganization, staff removal and re-assignment or closing the school. To no one's great surprise, such corrective plan work can often generate a push back response of procrastination, resistance and hostility, including both covert and open political action, by affected teachers, parents and other community members.

Based on her performance of this difficult work during the 8 months following her probationary appointment, the District's then Board of Education promoted Ms. Usack to Acting Principal of SHS, when Principal Kelly took a medical leave of absence. To enable Usack to continue the politically controversial remediation work unimpeded, the Board at that time also granted Ms. Usack early tenure; followed soon thereafter, by a merit pay increase. Based upon continued superior job performance, from the time of her initial appointment in 2002 to the present, Ms. Usack has received consistently positive performance evaluations from her professional educator supervisors.

At the request of then Superintendent Bryant, Ms. Kelly agreed to implement remedial corrective action at the still under-performing EDMS, on condition that the District also assign Ms. Usack to the remediation team. Thus, in the 2005-2006 school year, Superintendent Bryant's administrative team at EDMS consisted of Principal Lisa Kelly, Assistant Principal Theresa Usack and Assistant Principal Mack Knight. At that time, after 5 consecutive years on the SINI list, EDMS had been placed on the SED's list of "School Under Registration Review" ("SURR"). In the performance of corrective action plan implementation duties, Ms. Usack and the rest of the team met predictable resistance from affected EDMS teachers and parents. One of the EDMS teachers who expressed and displayed open animosity to Assistant Principal Usack, in particular, was Ms. Ginger Woolever; a teacher with whom Usack previously had worked in another school district.

4

The charges under arbitral review arose out of an incident during a field trip by the 8th grade class of Ernie Davis Middle School ("EDMS"), on April 7, 2006. EDMS teachers Ginger Woolever and Jeremy Sager planned and directed that excursion. They had originally set up a day trip to a nearby amusement park for most of the class, which excluded certain students they deemed to have "discipline problems". After Principal Kelly disapproved that plan, a more educational trip to Washington, D.C. was arranged, to which the entire 8th grade class, approximately two hundred (200) students, was invited.

Assistant Principals Knight and Usack were designated to accompany Ms. Woolever on that trip and subsequently asked to serve, along with teachers and volunteer parents, as "chaperones". When the two assistant principals were first asked to participate, neither were assigned students to supervise. However, approximately one week prior to the trip, Organizer G. Woolever informed Principal Kelly that there were "certain" students that "no one wants to supervise". At that time, Ms. Kelly asked Knight and Usack each to take on a group of those students for supervision throughout the trip.

Specifically, Ms. Usack was assigned students SH, PD, RD and CG, all described by Principal Kelly as "somewhat troubled girls" with whom Ms. Usack had "good rapport". For his part, Mr. Knight was assigned a group of five (5) boys, among them student IH, whose presence is particularly pertinent to one of the the incidents giving rise to the charges against Usack. Finally, Elmira Police Officer ("PO") Johnson, described by Ms. Woolever as the "School Resource Officer" assigned to EDMS, also was on the trip. He did not directly supervise any of the student participants, but rather was asked to attend in an "administrative" capacity.

On the evening of April 3, 2006, four days before departure, at a meeting with parents to which Assistant Principals Knight and Usack were not invited, Woolever presented the set of *ad hoc* instructions she had worked up for the trip.  As of April 2006, there was neither a District policy nor standardized rules relating to the conduct of class trips. As noted, below, central office administrators pointed out the policy void surrounding the Washington, D.C. trip when they tried, unsuccessfully, to dissuade the then Board of Education from pursuing the instant charges against Ms. Usack.  That Board did later articulate some supervisory standards of conduct in a new class trip policy enacted after the fact, which Superintendent Bryant distributed in a subsequent email notice to staff and principals advising them of the new policy.

On April 4, 2006, Woolever distributed her instructions for the upcoming trip to participants, including Knight and Usack, as an email attachment she labeled "DC for Dummies", including: "Students are expected to stay with their chaperones at all times [and] "students and chaperones need to be back on the bus (parked at the Lincoln Monument) by 7:55 PM. We leave at 8:oo PM sharp." Of note, all of the chaperones were also instructed to exchange cell phone numbers with one another, to "be available at all times" throughout the trip and to "call Johnson, Sager or Woolever if you have any problems".

The record demonstrates that almost nothing went right or according to plan on that April 7, 2007 trip from Elmira to Washington, D.C.  The five buses from "Covered Wagon Tours" were about 15 minutes late for the 3:15 AM scheduled departure.  When the group did get on the road, no preorder or prepay arrangements had been made for the planned breakfast stop for the 244 participants.   As a result of this and other delays, the busses did not arrive in Washington until 11:30 AM; more than two (2) hours behind

schedule.   That late arrival necessitated cancellation of the planned visit to the Capital Building and Congressional offices.  According to parent/chaperones Ms. Nancy Wallace and Mr. Randy Zigenhagen, the trip immediately became "even more chaotic"; with the groups chaperones left "on our own" for the duration of the day.

Following the aborted visit to the Capital, the various dispersed EDMS groups toured museums and ate lunch before reassembling at 2:30 PM for the final scheduled stop: a guided instructional tour of the Holocaust Museum.  After a dinner meal at the Reagan Center, they dispersed again for a "Walking Tour of the Monuments along the Mall".  Chaperones were instructed by Woolever to reassemble the groups at the circle at the base of the Lincoln Memorial "at 7:55 PM for an 8 PM departure".  Due to the tardy 11:30 am arrival time at the Capital that morning, however, the promised busses did not arrive at that rendezvous location until close to 9:00 pm [1]

Several chaperoned groups were the last to have dinner at the Reagan Center and begin the trek down the National Mall to the Lincoln Memorial.  Three of those groups left together: Assistant Principal Usack with four (4) female students, Assistant Principal Knight and his group five (5) boys and parent Nancy Wallace, with a group of five (5) students that included her daughter.  Shortly after 7:15 PM, Mr. Knight and his group of "rambunctious boys", including student I.H., went on ahead.  They arrived at the Lincoln Memorial several minutes ahead of the Usack/Wallace groups.  Meanwhile, Usack/Wallace and their intermingled groups meandered toward the rendezvous point, stopping at various souvenir kiosks and taking pictures along the way.

---

[1]  During cross-examination at the hearing, Ms. Woolever conceded that the contract she signed with the bus company specified that the roundtrip bus drivers must have an uninterrupted 9-hour rest period between destination arrival time and return trip departure time under governing federal DOT regulations.

Shortly after the Knight group went ahead, eight of the nine girls in the merged groups, including Nancy Wallace's daughter, asked if they could also "walk on ahead" to see the Lincoln Memorial before they boarded the busses. (Student R.D. elected to remain with Usack). Given the unimpeded view of the well-illuminated pathway for the remaining distance to the Lincoln Memorial, Wallace and Usack granted their request; after again reminding the eight students to be at the bus assembly point promptly at Tssp.m.

Nancy Wallace testified that when she reached the circle at approximately 7:45 p.m., none of her students was in sight. She walked up the steps of the Lincoln Memorial to view the famous statue before returning to the circle, where she reunited with her daughter and the other four girls of her group.[2] When Ms. Usack arrived at the circle a few minutes later, with student RD, the other students in her group were not in sight. An EDMS student told Usack they had climbed the steps to have a look at the Lincoln Memorial. Usack walked to the top of the Lincoln Memorial expecting to find the three students, but CG, PD and SH were not there. Ms. Usack asked teachers and fellow chaperones, including Assistant Principal Mack Knight, if anyone had seen her students PD, SH and CG, but no one recalled having seen the errant group of girls on the circle.[3]

With student RD in tow, Usack set off on an unassisted search of the area around the Lincoln Memorial and retraced her steps down the National Mall to the Washington

---

[2]    Ms. Wallace testified that they then "huddled together for warmth" on the circle and waited "at least another hour" for the busses to arrive.

[3]    At that time, Mr. Knight was not aware that student IH, from his own group and students PD and SH, from Ms. Usack's group, had all disobeyed instructions to remain at the circle and wandered away together to a nearby park.

Monument, all without locating the wayward students. She had attempted to call trip organizers Sanger and Woolever and P.O. Johnson on their cell phone, but received no answer. Finally, Usack called parent chaperone Randy Zigenhagen· and asked him to "tell Johnson, Woolever or Sager to call 911". When Ms. Usack returned to the bus circle, she approached Officer Johnson and personally asked if he had yet made the requested 911 calls. It is undisputed that Johnson stated, in words or substance, that he had not done so and would not do so; asserting that he "had no jurisdiction in DC".[4] Taken aback by this dismissive reply, Usack made her way to a nearby a nearby Park Police kiosk to report that CG, PD and SH were "missing" and might have "run away".

While Usack was speaking with the police officer at the kiosk, PD and SH approached from the direction of the nearby park in the company of IH, the male student whose unauthorized absence from Knight's group had not yet been yet noticed. When Usack admonished them for wandering away from the rendezvous point, IH asserted falsely that Knight had given him permission to go to the park until the busses arrived. In fact, Knight had not granted such permission and did not even know that IH had left the area until Usack brought him back with PD and SH.[5] Student CG was not with the other three wandering students, nor was she at the bus circle when Usack returned with the IH, PD and SH. Usack asked group organizer Woolever if she had seen student CG, and Woolever asserted, erroneously, that CG was "already on the bus". Usack searched each of the five busses and called for her by name using the bus

---

[4]    At the hearing, Ms. Woolever identified Johnson as a friend of hers who had served as a personal reference when she was hired in the District.

[5]    Mr. Knight estimated that I.H., P.D., and S.H. were gone between 15 to 2 0 minutes, in total, and also corroborated Ms. Usack's testimony that all three of those students were returned to the departure point prior to the arrival of the busses.

microphone, however, student CG was nowhere to be found.  Usack therefore returned to the nearest Park Police kiosk, with the intention of again asking for police assistance, but that kiosk was no longer manned.

When Usack trudged back to the bus line, EMDS teacher S. Dal$_{rym}$ple thrust a cell phone toward the Respondent, without revealing that CG's father was on the line. When Usack answered, CG's father angrily reported, in words or substance: "A police sergeant named Weis has my daughter.  Are you going to turn those busses around and go back and get her?"  Ms. Usack responded that she would follow up with Sergeant Weis, that the busses had not yet departed for Elmira and that she never would leave any student behind.

On cross examination, CG testified that Sergeant Weis had detained her at the Capital Hill Park Police Station, not because she was "lost", but to question her in connection with his investigation of reported rock-throwing activity by some youths she was with when he picked her up near the World War II Memorial.  Sergeant Weis reported to Ms. Usack that CG was safely in his custody and that he would return the wayward EDMS student to Ms. Usack "after completing the necessary paperwork". Sergeant Weis also told Usack that he had picked up the missing student "in the opposite direction of the Lincoln Memorial; clearly not where she was supposed to be". Following that conversation with Sergeant Weis, Ms. Usack called Mr. G. back, reassured him that his daughter was safe and that she would be placed on her bus as soon as the Park Police completed requisite paperwork.

Next, Ms. Usack contacted EDMS Principal Lisa Kelly, to whom she spoken several times throughout the day, and updated her on the situation.  Ms. Kelly directed Ms. Usack to stay behind with her bus to await CG's return and let the other busses go

on ahead under the supervision of Assistant Principal Knight. *As* Usack completed yet another call to CG's father to update him on the now delayed timetable, Woolever approached and asked: "What are we supposed to do?"  The Respondent replied, "You are supposed to do what the administrator on duty, Mr. Knight, asks you to do".  Shortly thereafter, Sergeant Weis delivered the errant student CG and all of the busses departed for Elmira where they arrived within minutes of one another.

Two days later, Principal Kelly contacted Superintendent Bryant at home, to give him an update about the trip, "in case he got any parent feedback".   Ms. Kelly testified that when she told him CG had "disengaged from the group" but was located and returned home safe, he replied: "Good, that's all I need to know.  There is nothing else to worry about." For his part, Superintendent Bryant testified:  "The good news, as far as I was concerned, was that everybody came back safe and sound.  So, we thought we would process it and take what we learned from it and move forward.  Certainly, neither Lisa (Kelly)  nor  I  thought  any  discipline  was  warranted,  or  appropriate  in  the circumstances".

However, Superintendent Bryant testified, "some" members of the Elmira School Board, as well as "certain very vocal" members of the community, were not satisfied with those conclusions.  Specifically, Superintendent Bryant recalled: "I had talked with (Board President) Mike Crimmins, who told me that he was getting 'a lot of letters and e-mails about the trip'.  So we decided to do a full investigation, which (School District attorney) John Ryan conducted.  Concerning that investigation, Ms Usack testified: "In addition to the written narrative I provided, attorney John Ryan interviewed me on three occasions.  I never had representation, nor was I ever told that whatever I said could be used against me in formal discipline".  However, by the end of April 2007, the

Respondent learned that the "community" was pressuring the District's administration to "bring charges" against her.

In that regard, former Superintendent Bryant testified: "Given the uproar over what happened, I thought people would be appeased with 'some' discipline.  So I suggested, to the Board, that perhaps a counseling memo would be appropriate.  Because, really, given the circumstances, as I understood them . . . the young lady in question had met someone on the Internet and planned to 'leave' all along.  I also got some information that some other chaperones on the trip had actually seen the young lady, going in the wrong direction, and made no attempt to stop her.  You know, it seemed not to be a negligent act, but rather it was middle school kids, and things happen".

The Superintendent went on to state: "Part of my job as superintendent is to both be fair to staff and represent the Board.  So at my request, John (Ryan) searched for similar types of cases.  One of our own Board members shared that he supervised a field trip to our revolutionary battle monument, Battle Monument Park, and when the seventh grade kids got off the bus, they 'just took off.  Another time, I got a call from one of our teachers, who was actually at that same park, and he reported that he had found a 'misplaced' child and would I call and let the supervising teacher know, as he did not have that teacher's cell phone number.  Things like that happen with kids that age.  My own car got pretty well known because if I was out during the school day, and I saw a kid just walking along, I knew they weren't where they were supposed to be".

Superintendent Bryant's investigation and recommendation notwithstanding, by the end of April 2007, "some members of the community" were still lobbying him to "bring charges" against Ms. Usack.  As Dr. Bryant testified: "At the time, John Ryan was

completing the investigation and, after he reported what had happened on other trips, I thought that would settle it. But I then learned that Board members Graham, Woods and Hurley, as well as Mary Beth Turner, as I recall, were insisting on a board meeting. Mary Beth Turner told Mike Crimmins that if I didn't convene such a meeting, she would request a 'special' Board meeting, maintaining that she was 'within her rights' to do so". Soon after that conversation, a Board meeting was convened, during which Dr. Bryant again recommended that the Respondent be issued a "Counseling Memo", in lieu of formal discipline.

According to the former Superintendent's unrefuted testimony, there was no support for that recommendation and the Board continued to pressure him to implement formal disciplinary action against Assistant Principal Usack. When asked what action the Board contemplated taking against Assistant Principal Knight, regarding his missing student IH, Dr. Bryant stated: "Really, nothing. The kids strayed, and then they came back. Those things happen with kids that age." When asked what he thought would have happened if he had not followed the Board's "strongly worded recommendation" to file disciplinary charges against Usack, the Superintendent opined: "I think two things would have happened. Mr. Graham indicated that State Ed. law allowed that 'anyone could bring charges so if I wasn't going to do it, they would'; let's just say, I felt my own tenure would be tenuous".

In short, Superintendent Bryant's testimony establishes that the Board members were determined to lodge §3020 (a) charges against Ms. Usack, irrespective of whether he filed such charges as District Superintendent and irrespective of whether the evidence supported such charges; and if he did not comply with the Board's "recommendation" that he file the charges as District Superintendent, his own

13

termination was "a real possibility". Against that context, Dr. Bryant reluctantly asked Attorney Ryan to draft charges proposing "the minimum we thought the Board would accept".

Ms. Usack received the following notification, dated August 16, 2006, over the signature of then Superintendent of Schools, Dr. Raymond Bryant:

> YOU ARE HEREBY CHARGED pursuant to Education Law Sections 3012 and 3020-a with neglect of duty and conduct unbecoming a tenured assistant principal, which conduct constitutes just cause for discipline against you or your removal as follows:
>
> **CHARGE 1: Conduct Unbecoming a Teacher and Misconduct**
>
> You are hereby charged with conduct unbecoming a teacher and misconduct in that:
>
> Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. One of the students was "CG".
>
> Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the student "CG" became separated from your group of four students.
>
> Specification 3. There existed a period of time when the student "CG" was missing from your assigned group during which period you failed to discover her absence.
>
> Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom (sic) you had been assigned to supervise.
>
> Specification 5. The student "CG" was later found by Capital Park Police.
>
> Specification 6. By reason of the foregoing, you endangered the safety of students and engaged in conduct unbecoming a teacher and in misconduct by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.
>
> **CHARGE 2: Neglect of Duty; Incompetent or Inefficient Service**
>
> You are hereby charged with neglect of duty and with incompetent or inefficient service in that:
>
> Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. One of the students was "CG".

14

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the student "CG" became separated from your group of four students.

Specification 3. There existed a period of time when the student "CG" was missing from your assigned group during which period you failed to discover her absence.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you had been assigned to supervise.

Specification 5. The student "CG" was later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and neglected your duty and rendered incompetent and inefficient service by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 3: Conduct Unbecoming a Teacher and Misconduct

You are hereby charged with conduct unbecoming a teacher and misconduct in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. Two of the students were "SH" and "PD".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the students "SH" and "PD" became separated from your group of four students.
Specification 3. There existed a period of time when the students "SH" and "PD") were missing from your assigned group during which period you failed to remain aware of their location and activities.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you bad been assigned to supervise.

Specification 5. The students "SH" and "PD" were later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and engaged in conduct unbecoming a teacher and in misconduct by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 4: Neglect of Duty; Incompetent or Inefficient Service

You are hereby charged with neglect of duty and with incompetent or inefficient service, in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. Two of the students were "SH" and "PD".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the students "SH" and "PD" became separated from your group of four students.

Specification 3. There existed a period of time when the students "SH" and "PD" were missing from your assigned group during which period you failed to remain aware of their location and activities

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you had been assigned to supervise.

Specification 5. The students "SH" and "PD" were later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and neglected your duty and rendered incompetent and inefficient service by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

Based on the conduct set forth in these charges, I am seeking a penalty of five (5) days suspension without pay as a tenured assistant principal in the Elmira City School District. [6]

## Positions of the Parties

The following statements of position are extrapolated from the respective post hearing briefs filed by Counsel.

### The District

In light of Respondent's failure to adequately supervise the students placed in her care, she was charged with neglect of duty and conduct unbecoming a tenured assistant principal. It is obvious that she showed extremely poor judgment in permitting the students to leave her company. Allowing eighth grade students to walk around unattended was entirely unreasonable considering, among other things, the Mall's expansive size, the students' lack of familiarity with the surrounding area, the large number of unknown (and potentially dangerous) people simultaneously moving through the Mall area, and the fact that dusk was approaching as the students set out on their own. The additional fact that Student CG had a well-known history of absenteeism and other forms of misconduct makes Respondent's lax supervision all the more troubling.

_____

[6] The Board Members rejected the Superintendent Bryant's proposed 5-day suspension penalty and some pushed for escalation to a discharge. Eventually, the Board settled on a 20-day suspension of Ms. Usack without pay as the penalty sought.

This proceeding does not concern whether certain parties have resisted Respondent's reform initiatives. Neither does it concern whether Respondent is a competent administrator. It is solely concerned with Respondent's conduct on the evening of April 7, 2006. On this point, the facts could not be clearer. Respondent allowed three students to move ahead of her group without adult supervision. She failed to keep the students within view and allowed thirty minutes or more to pass before making an effort to determine their whereabouts. This represented an undue risk to the students' safety and exposed the District to significant potential liability. For all of these reasons, Respondent is guilty of the charges against her by far more than a simple preponderance of the evidence.

Respondent plainly neglected her duty to supervise the students in her group and should be penalized accordingly. Her actions exhibited an extreme lack of care. As such, her conduct was plainly unbecoming a tenured assistant principal and constituted a serious neglect of her duty to supervise the students with the same care and prudence as a reasonably minded parent or guardian. To argue, as Respondent does, that no penalty is warranted in this instance is both nonsensical and contrary to precedent. A twenty-day suspension without pay is entirely reasonable, given Respondent's conduct and the forms of discipline imposed in prior proceedings.

## The Respondent

The Charges fail for three reasons. First, the District failed to introduce competent and sufficient evidence in support of the Charges. Second, the District has not shown the presence of Just Cause, which is required to impose discipline. Just Cause is unavailable because its notice component is lacking given the absence of any relevant Board policy regarding class trips and any relevant provisions for this trip in particular. Therefore, Ms. Usack had no notice that any of her proven actions or inactions could result in discipline. Third, Just Cause is precluded also by the selective prosecution of Ms. Usack for events and behavior for which previously no District official or employee has been disciplined in prior, similar instances. This disparate treatment also precludes Just Cause.

In the final analysis, the District did not meet its burden by a preponderance of the evidence and the charges should be dismissed in their entirety. The District's chief administrative officers as well as Ms. Usack's immediate supervisor did not believe her behavior warranted any form of discipline. These administrators insisted Charges were unwarranted both substantively and constitutionally. Nevertheless, the Board rejected those objections and insisted Charges be filed or it would punish or fire School Superintendent Raymond Bryant and Human Resources Director Bob Van Keuren. Under the Board's ultimatum, the superintendent reluctantly filed the Charges at issue. Not surprisingly, at the hearing, the Board failed to adequately support the charges.

These circumstances demonstrate the frivolity of the charges, which emphatically warrants the imposition of sanctions against the District. The instant charges are an example of an abuse of power that was condemned by the Commissioner of Education in the early 1990s. As the supporting affidavits show, Ms. Usack and her counsel have expended significant costs in defending this baseless disciplinary arbitration. These costs should be reimbursed upon the hearing officer's finding of frivolity.

## OPINION OF THE HEARING OFFICER

Under amended §3020 of the Education Law, Ms. Usack cannot be disciplined or removed from her position, except for "just cause". As I have held in prior cases, the statutory standard of §3020 (a) "just cause" is not expressly defined in the Education Law or in Education Department regulations, but a working definition has evolved over the years in the myriad decisions of Hearing Officers. Some have simply applied the administrative law standard of "arbitrary, unreasonable or capricious". But the better reasoned majority have adopted the "common law" definition evolved from thousands of reported decisions by arbitrators of "just cause" discipline cases arising under collectively bargained labor-management agreements in both the private and public sectors. *See. e.g.,* In re Board of Education. Wayne-Finger Lakes Board of Cooperative Educational Services (Donald Bogart), Decision No. 13,226 (1994); In re Greenburgh Central School Dist. No. 7 (Robert DeMichele), Decision No. 13/397 (1995); Appeal of Bd. of Ed. of Port Washington, Decision No. 14,280 (1999). *See also* South Eastern Pennsylvania Transportation Authority, 90 LA 844 (Lang, 1988); Carter-Wallace Inc. 89 LA 587 (Katz, 1987); Menasha Corporation. Lewisystems Division, 89 LA 1316 (Barren, 1987); Hussman Refrigerator Company, 68 LA 656 (Mansfield, 1977); Kroger Company, 25 LA 906 (Russell Smith, 1955), Warren Assemblies. Inc., 92 LA 521, 524 (Roumell, 1989); Pete Pasquinell Co., 68 LA 1068, 1070 (Jones, 1977); Polysar Incorporated, 91 LA 482, 484 (Strasshofer, 1988); SK Hand Tool Corp., 98 LA 643, 647 (Hodgson, 1992); Koven and Smith, Just Cause: The Seven Tests, 2nd Ed. (BNA, )at 8-9.

One such frequently cited arbitration decision contains the following just cause analysis checklist. *See* Enterprise Wire Company 46 LA 359 (Daugherty, 1966):

Question 1.  Did the employer give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?

Question 2.  Was the employer's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?

Question 3.  Did the employer, before administering discipline to an employee, conduct a fair and objective investigation to determine whether the Employee did in fact violate or disobey a rule or order of management?

Question 4.  Does the investigative record contain substantial evidence or proof that the employee was guilty as charged?

Question 5.  Has the employer applied its rules, orders, and penalties even handedly and without discrimination to all similarly situated employees?

Question 6.  Was the degree of discipline administered by the employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the service record of the employee?

The District presented four witnesses in support of its alleged factual premises for the charges and specifications: EDMS Principal Lisa Kelly, EDMS Assistant Principal Mack Knight, EDMS Teacher Ginger Woolever and EDMS Student CG. The consistent, credible and forthright testimony of Ms. Kelly and Mr. Knight contradict rather than support the District's allegations against the Respondent.  Moreover, both of those District witnesses fully corroborate Ms. Usack's account of the incident, as does the testimony of Respondent's witnesses Bryant, Wallace and Zigenhagen.  By contrast, the testimony of the District's other two witnesses, teacher Ginger Woolever and student CG, exhibit significant relevancy and credibility defects which render their contrary accounts of the incident on April 7, 2006 unworthy of belief.

On the threshold question of culpability, the record shows irreconcilable credibility conflicts between the sworn testimony of the District's chief witnesses and that of the charged employee and the other witnesses. Testimonial standoffs are not rare in adversarial proceedings and resolution of diametrically opposing testimony is a task which arbitrators frequently are called upon to perform. Numerous factors must be considered in making credibility determinations. These include: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.

In some cases, ostensibly differing recollections of witnesses can be reconciled in different but coherent and believable versions of "the Truth". In this case, however, it is apparent that District witnesses CG and Woolever did not give persuasive or even believable testimony. Specifically, CG's testimony that she "got lost" because Usack left her all on her own on the National Mall, but dutifully reported to the bus rendezvous point only to find no one from EDMS there, is flatly contradicted by all of the record evidence. Moreover, assertions by CG regarding her whereabouts and motivations for leaving her group that day are completely inconsistent with statements she gave to the District's school attorney during his investigation. Indeed, that evidence not only effectively impeaches the testimony CG gave at the hearing but also supports the former Superintendent's original assessment that she intentionally wandered away that day to pursue a separate agenda of her own.

Ms. Woolever's testimony is fatally undermined primarily by her long-standing admitted *animus* against Ms. Usack and her personal motivation to have Usack removed from the District; a personal bias and ulterior motive which Ms. Woolever openly acknowledged and amply demonstrated at the hearing in this matter. [7] In that regard, Woolever testified she considered Usack, with whom she had worked in another district before coming as a probationary teacher to Elmira, "involved in" the decision of that other district to deny her tenure. In addition to that lingering resentment, the record persuasively demonstrates that Woolever had good reason to deflect blame for the many shortcomings of the trip to someone other than herself. Finally, the record is replete with evidence that Woolever was one of several teachers subject to possible involuntary transfer from EMDS as part of the District Administration's corrective action plan at that historically underperforming school.

If Ms. Woolever's demonstrated bias against Ms. Usack were not discrediting enough, her hearing testimony also is riddled with self-contradiction, inconsistency, evasiveness, duplicity and outright implausibility. Just one example is the preposterous claim that she personally sprinted "as fast as humanly possible" from the Lincoln Memorial to the Washington Monument, circled that Monument twice trying to locate CG, and then dashed back to the Lincoln Memorial--all in the paranormal time of "no more than 10 minutes."

---

[7] Indeed, under cross-examination by Usack's attorney at the hearing, Woolever concluded her testimony with the summary declaration: "I don't like your client". She also conceded that she was one of several similarly disaffected EMDS teachers and a displaced EDMS administrator who pressured the Board for months to bring disciplinary charges against Usack. In that connection, Woolever admitted initiating personal back channel assistance to the four Board members who insisted upon bringing charges against the Respondent, despite the Ryan investigation and the Superintendent's recommendations.

## CONCLUSIONS

Under any and all of the above-quoted principles and authoritative precedent, the District failed to meet its burden of proving the charges it lodged against the Respondent.  For that reason alone, there is no just cause for imposition of the proposed disciplinary action.  Even if, *arguendo,* the District had persuasively demonstrated that some degree of culpability attached to Ms. Usack (which it failed to do), singling Usack out for discriminatory and disparate disciplinary action while overlooking identical conduct by her colleague Mack Knight (which it did do), violated the just cause standard.  In that regard, it is also undisputed that, except for unjustly targeting Usack for disparate treatment in this case, the District did not take formal disciplinary action against teachers or administrators in virtually indistinguishable facts and circumstances.  In short, to sustain the Board's prosecution of these charges against this Respondent in the facts and circumstances of this record would violate the fundamental just cause principle that disciplinary action of an employee be imposed fairly and justly to correct proven culpable negligence, incompetence or misconduct; not simply to harass and punish the charged employee.

In the 1990's the Commissioner of Education noted in a series of decisions <u>Appeal of Bd. of Ed. Eastchester U. F S. Q</u> 31 EDR 301 (1992); <u>Appeal of Bd of Ed. Goshen CSD,</u> 30 Ed. Dept. Rep 181, 187, (1990); <u>Matter of Bott v. Bd. of Ed.,</u> 41 NY2d 265 (1997) that "[t]he primary purpose of a disciplinary hearing is not punitive, but rather, to determine a teacher's fitness to teach and to carry on professional responsibilities… As [the Commissioner] noted, in <u>Goshen,</u> *supra,* '[t]his case raises serious questions about the use of the 3020-a process for multiple charges that largely lack substance and, in only one instance, even approach the level of teacher misconduct.'

. . . In such cases, one must question whether the extraordinary expenditure of time, energy, and resources is warranted. Given the high stakes in such proceedings and the obvious diversion of resources, I urge the district to consider less drastic alternatives to resolve personnel matters that, on the whole, fail to raise to the level of serious misconduct." Appeal of Bd. of Ed. Eastchester U.F.S.D, *supra* at 312

The New York State Legislature heard the Commissioner's concerns and amended Education Law in 1994, by directing a §3020-a hearing officer to formulate appropriate penalties against school districts for bringing such politically motivated prosecutions completely lacking in merit. Thus, Education Law §3020-(a)(4)(c) was enacted to provide for the reimbursement of State Education Department ("SED") costs and legal fees and costs incurred by a Respondent professional educator as a result of a District bringing, in whole or in part, "frivolous" charges. Specifically, Education Law Section 3020-a(4)(c), provides, in pertinent part (Emphasis added):

> The school board's decision to proceed with the charges may not be arbitrary, capricious, or discriminatory. If a hearing officer determines that any or all 3020-a charges filed against a teacher or administrator are frivolous, a district will have to reimburse the State Education Department and the teacher for all or a portion of the reasonable costs incurred as a result of the hearing, including the teacher's or administrator's attorney fees. The hearing officer shall indicate in the decision whether any of the charges brought by the employing board were frivolous as defined in section eight thousand three hundred three-a of the civil practice law and rules. If the hearing officer finds that all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges. If the hearing officer finds that some but not all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department a portion, in the discretion of the hearing officer, of the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee a portion, in the discretion of the hearing officer, of the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges.

In the final analysis, the record supports the conclusion that this case is not about negligence or incompetence by the Respondent, but rather all about a school board's knowing misuse of its §3020 (a) disciplinary powers by bringing frivolous charges against Assistant Principal Usack, in furtherance of a political agenda. Indeed, such abuse of power prompted Chancellor Emeritus of the New York State Board of Regents, Carl Hayden, to comment publicly: "There is nothing more unseemly to me than what I read about persistently in our paper, and I'm thinking in particularly about Elmira, where what we end up witnessing is a fight between adults over power." *(Elmira Star Gazette*, June 6, 2008). The conduct of the Elmira City School Board in bringing and prosecuting meritless charges against Teresa Usack, which were unsupported by its own investigations and dismissed for complete failure of proof after hearing, was precisely the type of power abuse which prompted the SED to recommend and the New York Legislature to enact Section 3020-a (4)(c) of the New York State <u>Education Law.</u>

**AWARD**

1)    For all of the reasons stated, *supra,* Charges 1,2,3 and 4 made against the Respondent Theresa Usack, by the Elmira City School District under §302o(a) of the NYS <u>Education Law</u> on August 16, 2006, are dismissed.

2)    Pursuant to the authority vested in me by <u>Education Law</u> §3020-a 4(c), the Elmira City School District is ordered to reimburse the NYSED the reasonable costs said Department incurred as a result of this proceeding and to reimburse the Respondent Theresa Usack for $4,330.00 of the legal fees and costs set forth in her sworn affidavit dated July 21, 2010.

_____

Nancy Faircloth Eischen

Signed at Spencer, New York on February 17, 2011

STATE OF NEW YORK
COUNTY OF TOMPKINS SS:

On this 17th day of February 2011, I, NANCY FAIRCLOTH EISCHEN, do hereby affirm and certify, that I am the individual described herein, that I executed the foregoing instrument and acknowledge the same as my decision on NYSED File #6, 371.

24

# Exhibit N

**September 13th, 2021**

**To whom it may concern,**

**My name is R        F.         , my employee ID is #.......  I have been employed with the NYCDOE for 20 years now.  I am extremely proud of all the work I've done with the communities of the Bronx that I've had the privilege of working with.  I am currently an Assistant Principal with Frederick Douglas Academy V in the Bronx.**

**<u>"Religious liberty is a foundational principle of enduring importance in America enshrined in our Constitution and other sources of Federal law."</u>**  I know that the law in this Country allows for personal religious beliefs and that's what makes me so proud to be an American, where my beliefs and freedoms are protected.  I get to work in a city that is literally called the Melting Pot of the Country.  It is filled with all different cultures and religions and we can live together respecting and encouraging one another's differences.

My faith, and religious journey is the most important thing in my life.  I am a devout Christian; my life is led by the Holy Spirit that lives inside of me.  It is my religious belief that my God is my healer and I put all my faith and hope in Him.  It is my religious belief that it is a complete betrayal of faith to put my hope and faith in any vaccine to keep my body healthy.  My God will heal me and my family.  We have all contracted covid and He kept us all, safe and whole.

Any blood that may be in any vaccines is sacrilegious and I cannot allow my body to be corrupted or made unclean.  1 Corinthians 3:17 "If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple".  Exodus 15:26 "I am the Lord that heals you."  Fetal cells that may be used in creating this vaccine, goes against my stance on abortion.  As a Christian I am against murder.  Exodus 20:13 "You shall not murder."  Therefore, taking this vaccine will desecrate my body.  Even though I have been fully vaccinated in my childhood, that choice was performed by the choices of my non-religious parents, whom I loved dearly.  As an adult, husband and father, I choose to live out my life through God's command from His Holy word, the Bible.

My faith and relationship in God are what helps guide my life and helps me discern what is needed to keep my body in line with the Word of God.  I am created in the image of God.  My body/blood is a sacred being and must remain pure in the sight of God.  Taking this vaccine or any other vaccine for that matter would go against everything I believe and base my life upon.

I ask that you please keep this confidential, I am only sharing these personal things so you could have a better understanding of my declination of this vaccine due to my religious beliefs.  Please understand my convictions.  Thank you for your time and consideration.

Sincerely,

R.        F

# Exhibit O

# TEACHER VACANCY CIRCULAR NO 4 CENTRAL REMOTE TEACHERS iZONE 2022 2023

NYC Department of Education

3.9 3.9 out of 5 stars

Remote

Full-time

## Location

Remote

## Full job description

# TEACHER VACANCY CIRCULAR NO 4 CENTRAL REMOTE TEACHERS iZONE 2022 2023

Posted Date: May 6, 2022 Deadline: Jun 3, 2022

New York United States

VIRTUAL

## Job Details

**(SUBJECT TO BUDGET AVAILABILITY)**

**POSITION:**

## Teacher - Central

Remote Instruction Teachers

**License/Eligibility Requirements:**

New York City licensed Social Studies, Science, English, Foreign Language, Math and Health tenured teachers in High School Grade Levels.

**Office:**

iZone

**Location:**

82-01 Rockaway Blvd, Ozone Park, NY 11416

Or other DOE offices

**Remote Teachers**

**Position Summary:**

Virtual Learning Classrooms aim to partner teachers from around the city with students to provide them with increased access to courses not available in their home schools, including, but not limited to Electives, AP Courses, and Foreign Language courses. This posting is for teachers interested in teaching in this full time program from September 2022 - June 2023. Remote instruction teachers will deliver instruction to and communicate with high school students in other locations using internet and required technological platforms. Please note that while students will not be in the same location as the teacher, this is an in person teaching position.

Remote Teachers are licensed teachers of high school grade levels who teach students virtually. Remote teachers will teach students in the following subject areas: Advanced Placement Subjects (Including but not limited to, AP Psychology, AP Spanish, AP US History, AP World History, AP Government, AP Calculus AB/BC, AP Macroeconomics, AP Statistics, AP Computer Science Principles and A, AP Environmental Science, AP English Language and Literature, and AP Seminar), electives (Including but not limited to, Forensics, Health, Media Literacy, Financial Literacy, science electives, Computer Science and Business) and Foreign Languages (Including but not limited to, Spanish, Chinese and French). Other subjects may be added. Students may be enrolled from multiple schools simultaneously, but total class size will not exceed contractual limits. Remote Teachers will be expected to participate in 10 sessions of professional learning workshops including an online course leading to a Learning Management System certification to occur during July and/or August prior to commencement of position with remaining

on-going professional learning during the year and will be paid at the per session rate for work beyond the contractual workday/work year. Remote teachers will perform required duties (including corresponding with home school staff, planning for remote instruction and assessment, communication and conferencing with students and/or parents). Duties and responsibilities are intended to emulate traditional teaching paradigms and create an equitable learning experience.

**Reports to:**

DIIT iZone Supervisor

**QUALIFICATIONS:**

- Minimum of four (4) years of teaching experience as a regularly appointed teacher. Knowledge of the common core standards as it relates to course.

- Extensive knowledge of the New York State and City Standards, meets Advanced Placement requirements (as appropriate) and is licensed in subject matter.

- Demonstrated expertise in an online learning environment designing and implementing standards-based instruction that specifies clear learning objectives, includes engaging activities and authentic assessments to measure mastery.

- Willingness to promote online dialogue to deepen the learning experience.

- Demonstrated ability with written and oral communications emphasis placed on the delivery of digital presentations.

- Demonstrated ability to use online learning, communication and other edtech tools as appropriate.

- Can differentiate instruction for individuals or groups of students based on instructional data and analysis as well as student characteristics.

- Can sustain and document flexible teaching schedules, which account for asynchronous and synchronous activities that are student-centered and maintain high standards for student engagement and success.

- Selected candidates will be asked to facilitate a demonstration lesson or planning activity to demonstrate aforementioned qualifications.

**PREFERRED SKILLS:**

- Demonstrated skill in team building, group dynamics, and facilitating collaborative learning.
- Proven history of being a self-starter who works well without constant supervision.

**DUTIES AND RESPONSIBILITIES:**

- Demonstrate competency in using data from assessments and other data sources to modify content and guide student learning.

- Modify engaging content and appropriate assessments in an online environment.

- Provide quality instruction to students using asynchronous and synchronous teaching methods (I.e. asynchronous = discussion forums, group work, written and digital assignments, posted content. Synchronous = online classrooms, webinars, chat rooms).

- Employ student-centered instructional strategies that are connected to real-world applications to engage students in learning.

- Facilitate and monitor online instruction groups/discussions to promote learning through higher-order thinking and group interaction.

- Provide a variety of ongoing and frequent teacher-student, teacher-teacher, and teacher-administrator interaction with participating schools.

- Provide prompt feedback, communicate high expectations, and teach to diverse talents and learning styles.

- Online communication between students and teachers is a significant component of this program to mimic in person communication. Therefore, teachers are expected to respond to student emails and grade assignments within 2 workdays, as well as monitor and respond to discussion postings daily during the school week.

- Regularly share with home school(s) student data including but not limited to grades and attendance. This includes the use of school selected platforms and systems.

- Incorporate and comply with FERPA, AUP and communicate privacy guidelines to students.

- Select and use a variety of online tools for communication, productivity, collaboration, data and performance analysis, presentation, research, and online content delivery as appropriate to the content area and student needs.

- Use communication technologies in a variety of mediums and contexts for teaching and learning.

- Apply technical troubleshooting skills (downloading plug-ins, uploading assignments, etc.)

- Participate in all professional development and peer mentoring exercises throughout the duration of service.

- Develop key relationships in order to work closely with home school staff, students and parents of participating schools, guidance counselors and central iZone staff.

- Participate in activities to identify best practices, address challenges and assess efficacy.

**WORKING CONDITIONS & LOCATION:**

- The maximum class size of a full virtual course not exceed UFT contractual limits.

- Teachers shall not be assigned more than twenty five (25) teaching periods per week and may teach up to five (5) remote classes; however, the maximum number of distinct courses shall not exceed three (3).

- Teachers must confer with students synchronously during programmed periods each week, as well as be available for asynchronous teaching approaches including but not limited to office hours, individual and small group conferencing and providing direction for independent student

work. Facilitate learning through supplied curriculum that teachers may supplement.

- Teachers are expected to teach in person from 82-01 Rockaway Blvd, Ozone Park, NY 11416 or other DOE office.

**Hours:**

As per Article Six of the Collective Bargaining Agreement

**Salary:**

As per UFT Contract

**Work Year:**

As per Article Six of the Collective Bargaining Agreement

**APPLICATION INSTRUCTIONS:**

Please be sure application includes cover letter, resume and your 6-digit file number.

Please send application via email to the following email address: iLearnNYC@schools.nyc.gov with the Subject line: "Fulltime Remote Teacher application."

Applications will be accepted through:

# JUNE 3, 2022

# An Equal Opportunity Employer M/F/D

It is the policy of the Department of Education of the City of New York to provide equal employment opportunities without regard to actual or perceived race, color, religion, creed, ethnicity, national origin, alienage, citizenship status, age, marital status, partnership status, disability, sexual orientation, gender(sex), military status, unemployment status, caregiver status, consumer credit history, prior record of arrest or conviction(except as permitted by law), predisposing genetic characteristics, or status as a victim of domestic violence, sexual offenses and stalking, and to maintain an environment free of harassment on any of the above - noted grounds, including sexual

harassment or retaliation. For more information, please refer to the DOE Non -
Discrimination Policy.

 

# Exhibit P

**STATE OF NEW YORK**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

_____

In the Matter of

**UNITED FEDERATION OF TEACHERS, LOCAL 2,**
**AFT, AFL-CIO,**

Charging Party,

-and-                                                                          <u>CASE NO. U-32479</u>

**BOARD OF EDUCATION OF THE CITY SCHOOL**
**DISTRICT OF THE CITY OF NEW YORK,**

Respondent.

_____

**ROBERT T. REILLY, GENERAL COUNSEL (ARIANA A. DONNELLAN of**
**counsel), for Charging Party**

**KAREN SOLIMANDO, EXECUTIVE DIRECTOR OF LABOR RELATIONS**
**(ALLISON S. BILLER of counsel), for Respondent**

<u>**BOARD DECISION AND ORDER**</u>

This case comes to us on exceptions filed by the Board of Education of the City

School District of the City of New York (District) to a decision of an Administrative Law

Judge (ALJ), granting an improper practice charge alleging that the District violated

§ 209-a.1 (d) of the Public Employees' Fair Employment Act (Act).[1]  The charge alleged

that the District violated the Act when it unilaterally began placing a "flag" in its computer

system next to the names of unit employees represented by the United Federation of

Teachers, Local 2, AFT, AFL-CIO (UFT), who have been the subject of discipline,

allegedly causing those employees to be denied opportunities for transfers and

permanent assignments.  Originally, the ALJ dismissed the charge, finding that the

flagging process was a duplicate, digitized version of certain documents in employees'

_____

[1] 54 PERB ¶ 4522 (2021).

Case No. U-32479

-2-

personnel files and that the manner in which the District maintains employees'

personnel files was not a mandatory subject of negotiations.[2]  On exceptions to that

decision, the Board remanded the matter to the ALJ for further development of the

record.[3]  On remand, the ALJ found that the "flagging" impacted terms and conditions of

employment, and that the District had violated the Act by instituting the flagging system.

On April 7, 2022, oral argument was held before the Board.

<u>EXCEPTIONS</u>

The District has filed nine exceptions to the ALJ's decision.  In its first two

exceptions, the District asserts that the ALJ incorrectly found a violation of § 209-a.1 (d)

of the Act on the basis that the evidence did not support her conclusion that employees

are unable to inquire through the UFT "what specific documents are linked to a flag."  To

the contrary, the District contends, the testimonial evidence was that the UFT could

obtain this information through the District and could check its accuracy by inspecting

the complete paper personnel file.[4]

The District's third and fourth exceptions reject the ALJ's finding that neither an

employee nor her UFT representative has access to the Galaxy system and neither is

able to personally view the flagged documents and whether they actually reflect the

contents of the documents in the personnel file.  Rather, the District maintains that the

ability to view the documents as maintained in the personnel file allows the UFT and its

members to verify the flagged documents.  Additionally, the District asserts that the UFT

---

[2] 51 PERB ¶ 4561 (2018).
[3] 52 PERB ¶ 3009 (2019).
[4] Exceptions 1-2.

Case No. U-32479

-3-

did not request such documents be produced, as such documents are redundant of the

personnel file, and thus "there is no reason why the [District] would not provide this

information."[5]

In exceptions five and six, the District argues that the ALJ erred in finding that

"the record is clear that flagging affects principals' decisions whether to select a teacher

in his or her school."  To the contrary, the District maintains that "the record shows that

the purpose of the flagg[ing] procedure is to give principals the opportunity to consider

or reconsider their decision after they have viewed the flagged documents."[6]  The

District further claims that no evidence was introduced that any teacher failed to obtain

a transfer on the basis that they had been "flagged" in the Galaxy system.

The District further alleges that there is no contractual right to a transfer, and that

"flagged" employees have the same right to apply for a transfer as those who have not

been flagged, and that there is no basis to require the digitization of the entire personnel

files.  Additionally, the District contends that principals have multiple ways of learning

about disciplinary histories, and, further, just as principals are not required to view the

paper files, so too "they are not required to view the flagged documents" before making

their hiring decision.[7]

The District further excepts to the ALJ's finding that "when viewing flagged

documents, principals are viewing only negative information contained in an employees

personnel file, without any information that might counterbalance the negative

---

[5] Exceptions 3-4.
[6] Exception 5.
[7] Exception 6, quoting 54 PERB ¶ 4522, at 4652-4653.

Case No. U-32479                                                    -4-

information such as years of positive observation reports or other positive material that may affect a principal's decision."[8]  Finally, the District excepts to the ALJ's finding that "the record shows that, in certain cases, letters annexed to a flag will be inaccurate if an employee is found, in arbitration, to have not engaged in the conduct set forth in a file letter, or to have engaged in a less severe misconduct."[9]

The UFT supports the ALJ's decision and contends that no basis has been demonstrated for reversal.

For the reasons given below, we affirm the ALJ's decision.

## FACTS

The facts in this matter are fully set out in the ALJ's thorough decision and are only addressed here as necessary to decide the exceptions.  On March 15, 2012, the District announced plans to initiate a new method of "flagging" negative work history in an online disciplinary support system that is linked to and accessible through its "Galaxy" computer system, an online budgetary system that provides a table of organization for all District offices and schools.

The flagging procedure makes information regarding an employees' disciplinary history with the District available to school principals when an employee is applying for a new position.  The information is only available to principals if they indicate in Galaxy that they intend to hire an individual for a position in their school.[10]  This process is

---

[8] Exception 7, quoting 54 PERB ¶ 4522, at 4653.
[9] Exception 8, quoting 54 PERB ¶ 4522, at 4653.
[10] Although the parties refer to the "hiring" of individuals, most of the individuals in question are already District employees, who are simply applying to transfer to a position at a different school or are seeking a permanent assignment.  Some applicants may also be former District employees, who are seeking to return to the District.

Case No. U-32479                                                                -5-

referred to as "intending" an employee in Galaxy.  If an employee's name has been

flagged, a "flag symbol" will appear next to the employee's name when a principal

"intends" the individual's name in Galaxy.[11]  The appearance of the "flag symbol"

indicates that there is information that is available to the principal by clicking on the flag.

One or more digitized documents may be linked to a flag and can be viewed by the

"intending" principal.  However, the District has represented that the decision whether or

not to click on the flag symbol and see the attached documents remains for the

principal; the District "considers the *optional* review of the disciplinary support unit flag

by hiring Principal/supervisor as an opportunity to learn about an employee's prior

history-similar to checking reference[s] before making a hiring decision."[12]

       When an "intending" principal moves to proceed, a dialogue box appears,

headed "Notification of Prior Disciplinary Action."  This dialogue box does not provide

any hyperlink to pdf documents.  It states that the prospective hire/transfer "has been

disciplined (on occasion(s) due to a prior report(s) of allegations of misconduct that

have been substantiated.")  The box instructs that for the intending principal to obtain

more information she should "contact your Senior Field Counsel or CFN HR Director."[13]

       The dialogue box then states: "If you wish to proceed with the action to intend to

bring this individual onto your budget please click below to acknowledge that you are

aware of and acknowledge the prior disciplinary action concerning this individual."[14]

---

[11] District Brief at 6, citing Jt Ex 1.  As the "flag symbol" is not reproduced in the cited
Exhibit, and the system is not available to the UFT, we adopt the District's
characterization for purposes of this decision.
[12] *Id* (citing Tr, at 83-84 (Rodi) emphasis in original).
[13] Jt Ex 1.
[14] *Id.*

Case No. U-32479                                                                                          -6-

"Intending" principals are given the option in the Galaxy system of proceeding with the hire or of cancelling the hire.[15]  In the event that the principal continues with "intending" the individual to the job, he or she is required to acknowledge awareness of the prior disciplinary action concerning the individual.[16]

At the bottom of the dialogue box, two buttons allow the "intending" principal to either "Apply" (thereby submitting a final decision either to proceed with or to cancel the hire) or to "Cancel" (thereby allowing the "intending" to pursue further information, either through the flag symbol and its attached documents, or the resources specified in the dialogue box).[17]

Katherine Rodi, Director of the District's Office of Employee Relations, oversees the Disciplinary Support Unit (DSU), which manages the District's online disciplinary support system.  The DSU tracks employee discipline and is responsible for flagging employee names when appropriate.  The DSU began flagging employee names in approximately May of 2012.

Rodi testified that the DSU will place a flag next to an employee's name in the Galaxy system only when two criteria are met.  First, a substantiated report of discipline or misconduct must have been issued by one of the District's three investigatory bodies: the Office of the Special Commissioner of Investigation, the Office of Special Investigations, or the Office of Equal Opportunity.[18]  Second, the DSU must have

---

[15] *Id.*
[16] *Id.*
[17] Jt Ex 1.
[18] Tr, at 73, 76.

Case No. U-32479                                                                       -7-

evidence that the employee received a copy of the relevant disciplinary document.[19]

That evidence normally consists of the employee's signature on the letter to be flagged,

or on a mail receipt.[20]  If those criteria have been met, the DSU will manually flag the

employee's name in the Galaxy system and will link a copy of the disciplinary document

in question to the flag.

      Rodi explained the several steps that must occur before a document is issued

that can lead to the flagging of the employee's name in Galaxy.  Initially, one of the

three investigatory bodies mentioned above must have conducted an investigation that

resulted in a report substantiating an allegation of wrongdoing against the employee.

Next, the principal must meet with the employee to discuss the report.  If the principal

issues a disciplinary letter as a result of the meeting, that letter may serve as a basis for

a flag.  As set forth above, the DSU must also have evidence that the employee

received a copy of that letter.[21]  Rodi testified that only documents that are in an

employee's personnel file can serve as a basis for flagging an employee's name.  If an

employee files a rebuttal to the letter of discipline, the rebuttal letter is also linked to the

flag in Galaxy.[22]  Disciplinary letters issued by principals due to misconduct that have

not been substantiated by an investigatory body, such as a letter admonishing an

employee for lateness, may not serve as a basis for flagging an employee's name and

cannot be annexed to a flag.[23]

---

[19] Tr, at 73.
[20] Tr, at 81.
[21] Tr, at 90.
[22] Tr, at 81.
[23] Tr, at 108.

Case No. U-32479                                                             -8-

Other documents that can be linked to a flag are those resulting from a

disciplinary proceeding held pursuant to § 3020-a of the New York State Education Law

(EL), but only if the employee was brought up on charges based on misconduct that is

set forth in a disciplinary letter that meets the criteria for imposing a flag.  An award or

settlement issued as part of such a proceeding can be attached to a flag, but only if the

award or settlement includes a finding or admission of culpability relating to the initial

disciplinary letter.[24]

A flag remains next to an employee's name as long as the underlying disciplinary

letter remains in the employee's file.[25]  Rodi testified that the DSU will remove a flag or

a document linked to a flag if an award issued in a EL § 3020-a disciplinary proceeding

dismisses the charges against an employee based on a finding that the alleged

misconduct did not occur, and if the award directs the District to remove the underlying

disciplinary letter from the employee's personnel file.[26]  If an award finds that the

misconduct occurred, but is insufficient for dismissal, the flag will remain next to the

employee's name, because the underlying letter finding misconduct remains in the

employee's personnel file.  The DSU will also remove a flag if a settlement requires it to

remove the disciplinary letter on which the flag was based.  Similarly, the DSU will

remove a flag if an employee successfully pursues a grievance challenging a letter on

which a flag is based, and the grievance decision directs the District to remove that

---

[24] Tr, at 90-91.  The EL § 3020-a disciplinary charges are not linked to a flag.  Tr, at 109.
[25] Tr, at 113.
[26] Tr, at 95, 98.

Case No. U-32479                                                         -9-

letter from the employee's personnel file.[27]

      According to the District, all documents linked to a flag are already included in employees' personnel files.  Although the UFT is unable to view the flags and the documents linked to them, it does not dispute that the linked documents are intended to be limited to the discipline related documents in each individual's personnel files.  Those paper files are maintained at the school where an employee is currently employed, or was last employed.  Because the District has not digitized the entire contents of employee personnel files, principals cannot view them online.  To view a copy of an employee's personnel file, a principal considering whether to hire an employee must contact the school where the employee's file is kept, and request that a copy be made and sent to him or her.  A principal should see, in an employee's personnel file, any document that has been flagged in Galaxy.

      Rodi testified that the flag serves a purely informational function in assuring that a hiring principal is aware of flagged information.  She further testified that flagging an employee's name does not restrict an employee's ability to apply for a new position or impose any restriction or limitation on the employee.  Rodi testified that principals are not required to take, or refrain from taking, any action when an employee's name has been flagged; they may, if they so choose, hire an employee whose name is flagged.[28] Rodi testified that she personally knows principals who have hired employees whose

---

[27] Tr, at 113. The collective bargaining agreement between the parties includes a grievance procedure that allows employees to seek the removal of disciplinary letters from their personnel files.
[28] Tr, at 87-88.

Case No. U-32479                                                                              -10-

names are flagged in Galaxy.[29]

      Other than those working in the DSU, only an employee's current principal and the principal who intends to hire the individual can view whether an employee's name is flagged in Galaxy.[30]  However, before their names are flagged, employees have received a copy of the letter of misconduct that is linked to the flag and have been advised that the document has been placed in their personnel file.

      Amy Arundell, the UFT's Director of Personnel, testified that she first learned of the flagging system in October 2012 when Mathew Polisheck, a unit member, called her and told her that a principal rescinded his offer of a position and told him that he could not hire him because there was a flag on his file in Galaxy.[31]  After Polisheck contacted her, Arundell received complaints from other employees who stated that they had interviewed for a position and were later told that they could not be hired, or that the principal had reconsidered his or her decision, because a flag was placed on their file in Galaxy.[32]  In Polisheck's case, Arundell learned that the principal decided not to hire him after learning of the existence of a substantiated case of discipline against Polisheck and a EL § 3020-a disciplinary proceeding.[33]

      Prior to the implementation of the flag symbols, principals could only view online an employee's service history, which shows whether an employee was rated effective or ineffective in his or her yearly evaluation, and whether an employee was suspended.[34]

---

[29] Tr, at 123.
[30] Tr, at 83.
[31] Tr, at 154-155.
[32] Tr, at 161.
[33] Tr, at 180.
[34] Tr, at 89, 126.

Case No. U-32479

-11-

To view an employee's disciplinary history, an "intending" principal would have to request the employee's personnel file from the employee's school.[35]

DISCUSSION

A public employer violates its duty to negotiate in good faith, in violation of § 209-a.1 (d) of the Act, when it unilaterally implements a change to a mandatorily negotiable term or condition of employment.[36]  We have long held that procedures for transfer and transfers themselves "are a mandatory subject of negotiations."[37]

On remand, the ALJ reassessed her prior finding that Rodi's testimony demonstrated that "[e]mployees may inquire through the UFT whether their name has been flagged in Galaxy *and what documents are linked to a flag.*"[38]  As the ALJ correctly noted, we held that, although Rodi's testimony supports the first part of her finding, it does not support the latter part of that finding, and hence we remanded this issue for a full review of the record.[39]

On her review of the record, the ALJ concluded that the record does not support a finding that employees may inquire through the UFT to learn what specific documents

---

[35] Tr, at 78.

[36] *See, eg, Town of Islip v NYS Pub Empl Relations Bd*, 23 NY3d 482, 484, 47 PERB ¶ 7006 (2014); *Patchogue-Medford Union Free Sch Dist*, 30 PERB ¶ 3041, 3094 (1997); *Monticello Cent Sch Dist*, 22 PERB ¶ 3002, 3008 (1989), *enforced* 22 PERB ¶ 7022 (Sup Ct, Albany County 1989).

[37] *City of Buffalo*, 9 PERB ¶ 3024, 3040 (1976); *see also White Plains PBA*, 9 PERB ¶ 3007, 3009 (1976) ("Assignment of 'both permanent jobs and work details on the basis of preference and seniority is a term and condition of employment and thus a mandatory subject of negotiations.'"), quoting *City of Albany [Albany Firefighters]*, 7 PERB ¶ 3142, 3147 (1974).

[38] 52 PERB ¶ 3009, at 3043 (emphasis added by the ALJ).

[39] 51 PERB ¶ 4561, at 4764.

Case No. U-32479                                                      -12-

are linked to a flag."[40]

From there, the ALJ moved to consideration of the impact of this finding on the

claims before her.  The ALJ's findings of fact and law here are instructive:

> The record is clear that flagging affects principals' decision whether
> to select a teacher for a position in his or her school.  Principals see
> flags, and the documents linked to a flag, when they are in the
> process of selecting a teacher for a position in their school.  At that
> point, the decision to select a teacher is not final.  In fact, the
> purpose of the flagged procedure is to give principals the opportunity
> to consider, or reconsider, their decision once they have viewed the
> flagged documents.
>
> Although the flagged documents are included in an employee's
> official school file, the record shows that principals are not required
> to, and often do not, request a copy of a teacher's entire official file
> before finally deciding whether to select an employee for a position in
> their school.  That is apparent from the fact that the record shows
> that only *if* a principal makes that request does the principal receive
> a copy.  It is also apparent from the fact that the flagging system was
> created for that reason; that is, principals had placed employees in
> their school without being aware of the employees' negative
> disciplinary history involving serious matters.
>
> Further, when viewing flagged documents, principals are viewing
> only negative information contained in an employee's file, without
> any information that might counter-balance the negative information,
> such as years of positive observation reports or other positive
> material, that may affect a principal's decision whether or not to
> select an employee for a position.  The record also shows that, in
> certain cases, letters annexed to a flag will be inaccurate if an
> employee is found, in arbitration, to have not engaged in the conduct
> set forth in a file letter, or to have engaged in a less severe
> misconduct.[41]

---

[40] 54 PERB ¶ 4522, at 4652.  As neither the District nor the UFT submitted additional
evidence, the ALJ relied on the evidence at the hearing before her; in her review, she
based her determination on the limited information Arundell received from Rodi, that is,
whether specific individuals had been flagged, and not the documents attached to the
flags.  *Id.*
[41] 54 PERB ¶ 4522, at 4563.

Case No. U-32479                                                                         -13-

As the ALJ found, Rodi testified that flagged letters are only removed from Galaxy if the arbitration award specifically directs that the letter be removed from a teacher's official file. Therefore, a principal may view a flagged letter when the conduct underlying that letter has been held in arbitration to either not have occurred or to have occurred in a different manner or degree than that which is set forth in the flagged letter, if the arbitration award does not specifically direct removal of the letter.

The ALJ's factual determinations, particularly her credibility determinations, "are generally entitled to great weight unless there is objective evidence in the record compelling a conclusion that the credibility finding is manifestly incorrect."[42] No such objective evidence has been raised before us. The ALJ reasonably exercised her discretion in taking a closer look at the specific testimony of both Arundell and of Rodi on remand. Moreover, both parties had the opportunity to submit further evidence on the factual issues. Neither availed themselves of the opportunity, and they are now bound by the evidence they chose to submit.

We affirm the ALJ's finding that the District made a change to the procedures to be used to fill a position, a mandatory subject of negotiations. Prior to the implementation of the "flagging" system, an "intending" principal who wished to see an employee's disciplinary history would request the employee's full personnel file from the employee's school. The personnel file would include not only the employee's negative

---

[42] *Pine Valley Cent Sch Dist*, 51 PERB ¶ 3036, 3160 (2018), quoting *Village of Scarsdale*, 50 PERB ¶ 3007, n 51 (2017), *confd sub nom Village of Scarsdale v NYS Pub Empl Relations Bd*, 55 PERB ¶ 7008 (2d Dept 2022). *See also Pleasantville Union Free Sch Dist*, 51 PERB ¶ 3024, 3100 (2018); *Village of Endicott*, 47 PERB ¶ 3017, 3051 (2014).

Case No. U-32479

disciplinary history, but also any positive history, such as positive performance evaluations, commendations from managers, and awards, that might counterbalance the disciplinary history.  Under the new "flagging" system, however, such positive history is no longer available to "intending" principals, who receive only negative information on employees they intend to hire.

Moreover, prior to the change at issue here, whether to look at the personnel file at all was left to an "intending" principal's discretion.  Now, the negative portion of an employees' personnel file is fed automatically to "intending" principals regardless of whether they express a desire to see the employee's personnel file or not.  As the District concedes, this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

These changes, both the automatic nature of providing the information and providing solely the negative portions of the employee's personnel file, represent changes to the prior procedure as to effectuating transfers within the District.  These changes have an adverse effect on employees' terms and conditions of employment as the "intending" principle receives a purely negative, decontextualized version of the personnel file, unlike in the past, where "intending" principals, if they saw the personnel file at all, would see the full personnel file, including both positive and negative history. Consistent with our prior precedent, we find these unilateral changes to the procedure used to fill positions affect terms and conditions of employment, and are a mandatory

Case No. U-32479                                                              -15-

subject of bargaining.[43]  For that reason, we affirm the ALJ's finding that the District

violated the Act.

We do not find the adoption of flagging to be in and of itself a disciplinary action.

The record is clear that teachers who have been flagged remain eligible to apply for

transfers just as do their colleagues who have not been.  Rather, we grant relief

because of the unilateral change of procedures impacting terms and conditions of

employment—here, by procedurally incentivizing principals to peruse and assess prior

discipline, or, at a minimum, requiring them to acknowledge the existence of such

discipline.  For these reasons, we find that the unilateral adoption of this new procedure

without negotiation with the UFT violates § 209-a.1 (d) of the Act.

The charge also states that "[i]n addition, none of the affected employees would

have an opportunity to review the information upon which the 'flag symbol' was entered

or to ascertain or contest whether the disciplinary action the entry is based on actually

occurred or is in error."[44]  Later in the charge, the UFT asserts that the District "failed to

bargain in good faith over a mandatory subject of bargaining—employee discipline,

*transfer* and other personnel actions—and therefore committed an improper practice

---

[43] *See Niagara Falls Police Captains and Lieutenants Assn*, 33 PERB ¶ 3058, 3161 (2000) ("We have held . . . that the procedures to be used to fill a position . . . are a mandatory subject of negotiation."), citing *Schenectady Patrolmen's Benevolent Assn*, 21 PERB ¶ 3022 (1988); *Dutchess County BOCES Faculty Assn, NEA/NY*, 17 PERB ¶ 3120 (1984), *confd sub nom Matter of Dutchess County Bd of Coop Educ Serv,* 122 AD2d 845, 19 PERB ¶ 7018 (2d Dept 1986); *White Plains Police Benevolent Assn*, 9 PERB ¶ 3007 (1976).  *See also Dutchess Community College and County of Dutchess*, 46 PERB ¶ 3009, 3016 (2013).  *See generally City of Watertown v State of NY Pub Empl Relations Bd*, 95 NY2d 73, 33 PERB ¶ 7007 (2000) ("bargaining is mandatory if the procedures qualify as a "term and condition" of employment").
[44] Charge, ¶ 6.

Case No. U-32479

under the Act."[45]  Among the relief sought, the charge requested an order "compelling the Board to negotiate in good faith with the UFT regarding the implementation, procedures for and impact of the employee 'flag symbols.'"[46]

We note that we have long held that "the right of an employee to review his personnel file bears a direct and significant relationship to working conditions, including possible demotion, promotion, and discipline, rendering the demand mandatorily negotiable."[47]  Here, the District has culled out the disciplinary history portion of the personnel file, and made only that portion easily and immediately available for principals to consult in determining whether or not to finalize the decision to grant an employee's request to transfer, or an application to a promotional position.  Indeed, by requiring the "intending" principal to acknowledge that she is aware that the employee has a disciplinary history, the District has created an incentive for the "intending" principal to consult the digitized materials.

The convenience of accessing the digital excerpt from the personnel file, rather than taking the steps to obtain the full paper file, mean that the excerpted digital materials are more likely than not to be used in place of the full file in making decisions as to transfers, promotions and other lateral hiring or recall decisions.  However, as the UFT has alleged, and the District has admitted, neither the UFT nor the individual

---

[45] Charge, ¶ 9 (emphasis added).

[46] Charge, ¶ 12.

[47] *City of Schenectady*, 21 PERB ¶ 3022, 3049 (1988); *Town of Carmel,* 29 PERB ¶ 3053, 3121-3122, n 3 (1996) ("notice of entries in personnel files" a mandatory subject). *See  generally Niagara Falls Police Club (Drinks-Bruder)*, 52 PERB ¶ 3007, 3029 (2019) (union satisfied its statutory obligation by successfully resolving a previously filed unit-wide grievance in the matter so that everyone, including the charging party, had the opportunity to review their personnel files).

Case No. U-32479

employee has the ability to access the "flag symbol" and the materials attached thereto, to ascertain if they are in fact materials that have been properly placed, and properly remain, in the personnel file.

The reasons that underlay our finding in *City of Schenectady* that access to paper personnel files is a mandatory subject apply with full force and vigor to these digitized disciplinary history excerpts, which are every bit as likely, if not more so, to affect working conditions, including transfer, promotion and other opportunities. We therefore find that the District violated § 209-a.1 (d) of the Act by unilaterally instituting the flagging system without having negotiated with the UFT as to notification to employees that they have been "flagged" and access to the materials attached to the "flag symbol" sufficient to permit verification that such materials were placed in the employees' personnel files and properly remain within them.

These same factors lead us to conclude that the flagging system is not, as the District argued, a mere optional "opportunity to learn about an employee's prior history-similar to checking reference[s] before making a hiring decision." Moreover, the District concedes that this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

Taken as a whole, then, the flag, the dialogue boxes encouraging the intending principals to either review the flagged documents, seek information through Senior Field Counsel or the CFN HR Director, and the requirement, prior to finalizing or canceling the transaction, that the "intending" principal acknowledge the existence of the disciplinary history, effectively amount to the addition of a new procedure with respect to

Case No. U-32479

-18-

such transfers.

Additionally, the flagging process may reasonably be found to establish a new criterion for such appointments, that is, the consideration of the applicant's disciplinary history. As we have long held, a "criterion for appointment or promotion is a managerial prerogative beyond the scope of mandatory negotiation, if applicable only to prospective employees or to future promotion of current employees."[48] The same considerations and the same result applies to criteria for transfers.[49] Accordingly, we find that the UFT did not establish a violation of § 209-a.1 (d) of the Act by requiring principals to consider the disciplinary history of applicants for transfer or promotional positions.

However, we affirm the ALJ's finding that the "flagging" process is a mandatory subject of negotiations to the extent that the process affects terms and conditions of employment by denying employees notice that they have been "flagged" and an opportunity to view the materials attached to the "flag symbol" and to contest its appropriateness for inclusion as part of the personnel file. To the extent that the District has imposed a new criteria for transfer and promotional applications, the consideration of the applicant's disciplinary history, we find that no violation of the Act has been established. We note that our decision is made without prejudice to the right to bargain upon demand the impact of this decision.

---

[48] *Rensselaer City Sch Dist*, 13 PERB ¶ 3051, 3084-3085 (1980). *See also City of Niagara Falls*, 33 PERB ¶ 3058, 3161-3162 (2000); *City of Buffalo*, 29 PERB ¶ 3023, 3053 (1996) (qualifications non-mandatory); *Addison Cent Sch Dist*, 13 PERB ¶ 3060, (1980) (criteria for promotion non-mandatory); *see generally Levitt v Bd of Collective Bargaining of the City of NY*, 79 NY2d 120, 128, 29 PERB ¶ 7516 (1992).
[49] *City of Schenectady*, 21 PERB ¶ 3022, at 3050-3051.

Case No. U-32479

-19-

IT IS, THEREFORE, ORDERED that the District will forthwith:

1.      Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file; and

2.      Sign and post the attached notice at all physical and electronic locations customarily used by it to post notices to unit employees.

DATED:  June 13, 2022
          Albany, New York

John F. Wirenius, Chair

Anthony Zumbolo, Member

Rosemary A. Townley, Member

# NOTICE TO ALL EMPLOYEES

**PURSUANT TO**
**THE DECISION AND ORDER OF THE**

**NEW YORK STATE**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

**and in order to effectuate the policies of the**

**NEW YORK STATE**
**PUBLIC EMPLOYEES' FAIR EMPLOYMENT ACT**

**we hereby notify all employees of the Board of Education of the City School District of the City of New York (District) in the unit represented by the United Federation of Teachers, Local 2, AFT, AFL-CIO (UFT), that the District will forthwith:**

1. Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file.

**Dated** . . . . . . . . . .      **By** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

on behalf of the **BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK**

*This Notice must remain posted for 30 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material.*

# Exhibit Q

Case 1:24-cv-07795-DG-JAM Document 31 Filed 06/12/25 Page 90 of 101 PageID #: 369

# EXHIBIT 13

Case 1:24-cv-07795-DG-JAM    Document 31    Filed 06/12/25    Page 91 of 101 PageID #: 370

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------ x

REGINA McELROY,

                                       Petitioner,

                 -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; CARMEN
FARINA, CHANCELLOR OF NEW YORK CITY
DEPARTMENT OF EDUCATION,

                                 Respondents,

For an Order and Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules.

------------------------------------------------------------------------ x

**AFFIDAVIT OF
KATHERINE G. RODI IN
SUPPORT OF
RESPONDENTS' VERIFIED
ANSWER**

Index No. 160663/16

| STATE OF NEW YORK | : | |
|---|---|---|
| | : | ss: |
| COUNTY OF KINGS | : | |

        **KATHERINE G. RODI,** being duly sworn, deposes and says:

        1.      I am the Executive Director of the Office of Employee Relations for the

Board of Education of the City School District of the City of New York ("BOE") (also known as

and sued herein as the "New York City Department of Education") and I have held this position

since January 2013. Prior to serving in my current position, I was the Director of the

Disciplinary Support Unit for the BOE, and prior to that, I served as a Senior Counsel for the

BOE for approximately six years.

        2.      One of the offices I oversee in my current position is the Office of

Personnel Investigation ("OPI"). OPI handles all background checks, arrest notifications, and

reassignments for the BOE.

3.      This affidavit is based on my own personal knowledge, a review of the books and records of the BOE, and conversations with BOE and New York City employees, as set forth herein.  I submit this affidavit in support of Respondents' Verified Answer in this proceeding.

## A.      Background On BOE Personnel Database

4.      I am advised that Petitioner has brought this proceeding, in part, to remove alleged "problem codes" or "flags" associated with her name within BOE's internal systems and to challenge the BOE's purported decision to place her on an "Ineligible/Inquiry List."

5.      As an initial matter, the BOE does not maintain an Ineligible/Inquiry List.

6.      The BOE maintains employment records and employee work histories that accurately reflect the reason an employee separated from BOE service.  For example, BOE maintains personnel records which would generally reflect this information.

7.      In addition, the BOE has codes in its internal electronic systems designed to engender attention should the individual seek employment, re-employment, or to change titles with BOE.  Such code might be used where, for example, an employee left BOE employment with a performance issue, or with substantiated misconduct charges pending.  This is designed to ensure that prior to any new employment with BOE, that employee's application would undergo further review.

8.      The code does not, itself, provide the specific information.  Rather, the code simply indicates that OPI should conduct a review of this person's application and related documents.

9.      Discontinuance of probationary service indicates a performance issue, and a resulting discontinuance code is entered into BOE's New York City Automated Personnel System ("NYCAPS").  When a probationary employee is discontinued, the code is inserted

- 2 -

automatically. If a discontinued employee were "nominated"[1] in the BOE's "Galaxy" system for subsequent employment with BOE or a BOE vendor, the code would be seen only by OPI – not the nominating officer – and would indicate to OPI that the discontinued employee's application would need to be reviewed by OPI before the nominating officer's hiring request could be approved.

> 10.    The BOE's employment codes are for internal BOE purposes only.

**B.    BOE "Codes" Regarding Petitioner**

> 11.    At the request of the Office of Corporation Counsel, I reviewed the BOE's NYCAPS information setting forth Petitioner's employment history with the BOE, as well as other documents kept and maintained at the central offices of the BOE regarding Petitioner.

> 12.    Petitioner's probationary service as a teacher at P.S. 102Q was discontinued on August 20, 2016. However, following her discontinuance in August of 2016, Petitioner was subsequently granted security clearance by the BOE to serve as a Universal Pre-Kindergarten teacher for a BOE vendor company.

> 13.    It is my understanding that Petitioner alleges that the placement of a "problem code" on her file was arbitrary and capricious.

> 14. There was no "problem code" placed specifically on the BOE's NYCAPS file. Rather, as explained above, when petitioner was discontinued as a probationary employee, a code merely reflecting that discontinuance was inserted automatically.

---

[1] Nomination is a process in which an applicant is selected for hire pending review and approval by OPI. This is a process that all applicants must complete prior to beginning employment or changing positions with the BOE.

- 3 -

Case 1:24-cv-07795-DG-JAM    Document 31    Filed 06/12/25    Page 94 of 101 PageID #: 373

15.     Petitioner has never been prohibited from applying for a new teaching position with BOE or with a BOE vendor.  However, as explained above, all applicants are subject to an OPI review prior to employment or security clearance by the BOE.

16.     Following her discontinuance, Petitioner was subsequently cleared to work in her current position as a teacher with a BOE Universal Pre-Kindergarten through a BOE vendor, and the code previously inserted into Petitioner's NYCAPS profile did not prevent her from obtaining this subsequent employment with a BOE vendor.

17.     Nonetheless, Petitioner's discontinuance remains on her service history. Therefore, if Petitioner applies for another teaching position within the DOE, the hiring principal could access Petitioner's service history and would see her prior discontinuance from P.S. 102Q. It should be noted, however, that Petitioner's service history does not prevent a principal or any other employer from nominating Petitioner for a position.

_Katherine G. Rodi_
**KATHERINE G. RODI**

Sworn to before me this 18th day
of January 2017

_____
Notary Public

NOTARY PUBLIC
MALLORY OSGOOD SULLIVAN
No. 02SU6335673
Exp. 01/19/2029
KINGS COUNTY
STATE OF NEW YORK

- 4 -

# Exhibit R

Page 68

                    DIRECT/RODI

1                    Your next witness, please.

2          MS. BILLER:  I would like to

3    call Ms. Rodi, please.

4          JUDGE BLASSMAN:  Please

5    approach and I will swear you in.

6          Do you swear or affirm to tell

7    the truth and nothing but the truth in

8    this proceeding?

9          THE WITNESS:  I do.

10         JUDGE BLASSMAN:  Thank you.

11         Can you please state your full

12   name for the record.

13         THE WITNESS:  My full name is

14   Katherine Rodi, R-O-D-I.

15   DIRECT EXAMINATION

16   BY MS. BILLER:

17        Q.       By whom are you employed by?

18        A.       I'm employed by the New York

19   City Department of Education.

20        Q.       What capacity?

21        A.       I'm the director of the office

22   of Employee Relations.

23        Q.       How long have you held that

24   position?

1                        DIRECT/RODI

2        A.        I held that position for two

3   and a half years.

4        Q.        And prior to being the director

5   of Employee Relations, what other job titles

6   have you held within the Department of

7   Education?

8        A.        I was an agency attorney, I was

9   a senior counsel and I was the director of

10  the Disciplinary Support Unit.

11       Q.        As director of Employee

12  Relations, what are some of your job duties

13  and responsibilities?

14       A.        I oversee several units.  I

15  oversee the Office of Personnel

16  Investigation, I oversee the Office of

17  Employee Relations, I oversee the Office of

18  Safety and Health, I oversee it, it is not

19  really an office, but the Disciplinary

20  Support Unit work.

21       Q.        Can you explain to us what the

22  Disciplinary Support Unit is?

23       A.        It is a unit within my office

24  that manages the on-line system that is the

25  Disciplinary Support System.

Page 70

DIRECT/RODI

1

2                    And what we do, we check and

3    track and eventually flag folks.  We check

4    older discipline, older substantiated

5    reports, we review them, we track them and

6    then if all the qualifications that we build

7    together are met, then we may flag a person.

8         Q.        Can you give us the years that

9    you were responsible for overseeing the

10   disciplinary support unit?

11        A.        I was hired in June of 2012.  I

12   started in July, early July of 2012.  Then I

13   was promoted to the director of Employee

14   Relations in January of 2013 and then I

15   subsumed DSU into my current work.

16                    JUDGE BLASSMAN:  DSU?

17                    THE WITNESS:  The disciplinary

18        support unit.

19                    JUDGE BLASSMAN:  So, since when

20        have you been overseeing disciplinary

21        support.

22        A.        It has basically been under my

23   portfolio since July of 2012.

24        Q.        Are you aware when the flagging

25   was implemented, began to be implemented?

Page 71

1                    DIRECT/RODI
2        A.        I was invited to a meeting
3   about disciplinary support projects, I want
4   to say it was like April of 2012 at that
5   meeting there were all the senior counsel, I
6   was in the role of senior counsel at the
7   time.  So, all the senior counsel, there
8   where I think there were superintendents,
9   other random DOE staff and we got a
10  presentation about the DSU.
11                 By the time I started in July
12  at least a couple of hundred people had been
13  flagged.  So, I think it started in May or
14  June of 2012.
15       Q.        Are you familiar with the
16  Galaxy system?
17       A.        Yes.
18       Q.        What is the Galaxy system?
19       A.        The Galaxy system is actually a
20  budgetary system that provides table of
21  organization for all DOE offices and
22  schools.
23                 So, it is a budget driven
24  system that basically tracks all current
25  employees by the order by where they work.

Page 72

1                    DIRECT/RODI

2        Q.        What, if any, involvement do

3    you have with the Galaxy system?

4        A.        As being part of Human

5    Resources, I use the Galaxy system a lot.  To

6    check people's status and then the DSU, the

7    Disciplinary Support project, it linked to

8    Galaxy, but it is not like a part of Galaxy.

9                 JUDGE BLASSMAN:  It is linked

10        to Galaxy?

11                 THE WITNESS:  It is linked to

12        Galaxy.

13        Q.        Are you familiar with the

14    Disciplinary Support Unit flag?

15        A.        Yes, I am.

16        Q.        I know we heard much talk about

17    it.

18                 Can you briefly define for us

19    what the disciplinary support unit flag is?

20        A.        Sure.  The flag is a reflection

21    of what we pulled into the DSU system.  The

22    system is a web based system.

23                 It is set up so that no one can

24    be accidentally or easily flagged.  It is set

25    up so that if I want to kind of open a folder

Page 73

DIRECT/RODI

1
2    for a person, I have to put in their name or
3    an identifier such as a Social Security
4    number, an employee I.D. and then that
5    person's name would be automatically
6    populated from the Galaxy data.
7                    Once I have the person's
8    information up I can then attach documents to
9    the person's name.
10                    Just attaching a document to a
11   person's name doesn't flag them.  What it has
12   to do it has to meet two qualifications.
13                    Number one, there has to be a
14   substantiated report of discipline issued
15   from an investigatory body.
16                    Then second there has to be a
17   letter of discipline that has been --  that
18   has evidenced that the person received the
19   discipline.
20                    Once both those two factors are
21   met a person is then manually flagged.
22                    So, even if the two documents
23   were both there, unless someone went in there
24   and looked at it, a person couldn't be
25   flagged.  It is not, the system doesn't read